HOME SAVINGS BANK v. HOSIE.[1]

1. GUARANTY — HOW CONSTRUED — SURROUNDING CIRCUMSTANCES.
   A contract of guaranty should be construed so as to give effect to the intention of the parties as expressed in the instrument, read in the light of the surrounding circumstances.

2. SAME — CONTINUING CONTRACT — DEATH OF OBLIGOR — REVOCATION.
   A bond executed by directors and stockholders to secure borrowed money which might be required for the corporate business during the ensuing year, not exceeding a specified sum, is a continuing guaranty for the time specified, and the estate of one of the obligors, who died within the year, is liable for paper discounted or renewed under it; his death not operating to revoke a contract which was irrevocable in his lifetime.

3. SAME — RENEWAL BOND — CONSIDERATION.
   A bank, under an agreement with the stockholders of a corporation, accepted their bond as a continuing security for such discounts as might be required by the corporation in its business for one year. At the expiration of the year, this bond was surrendered, and a like bond was executed for the ensuing year, a large part of the indebtedness covered by it having been incurred under the former bond. Payment of this indebtedness would have been required, and further loans refused, by the bank, except for the giving of the new bond. *Held*, that there was a sufficient consideration for the renewal bond.

4. PROMISSORY NOTES — DEMAND.
   A promissory note payable on demand, with interest, is not a continuing security, on which the indorsers will remain liable until actual demand, however long delayed, but, on the contrary, such a note must be presented within a reasonable time, in order to hold indorsers.

5. SAME — DELAYED PRESENTMENT — RELEASE OF INDORSERS.
   A delay of 2½ years in presenting such a note for payment, where all the parties reside in the same city and might be readily notified, will release indorsers.

---

[1] Appellee's application for rehearing denied January 20, 1899.

Error to Wayne; Lillibridge, J.   Submitted November 22, 1898.   Decided December 28, 1898.

The Home Savings Bank presented claims against the estate of J. Huff Jones, deceased.   The claims were allowed by the commissioners, and Robert Hosie and Griffin D. G. Thurston, executors, appealed to the circuit court.   From a judgment there for claimant, defendants bring error.   Modified and affirmed.

*Walker & Spalding,* for appellants.

*George W. Radford,* for appellee.

LONG, J.   This is an appeal from the action of the commissioners on claims in the estate of J. Huff Jones. The claims were allowed by the commissioners; and on appeal to the circuit court the claimant bank had judgment for $36,490.72; $30,600.81 on the first claim, and $5,889.91 on the second claim.   The cause was heard before the court without a jury, and findings of fact and law made by the trial court.

It appears from the findings that the Detroit Motor Company is a corporation organized under the laws of this State; that, during the period covered by the transactions in controversy, J. Huff Jones and five others were stockholders and directors of the company; that, from the organization of the company until his death, J. Huff Jones was a stockholder, director, and vice-president of the company; that prior to September 13, 1890, the company was a borrower at the Home Savings Bank upon notes of the company, indorsed by the directors, and that, for the purpose of facilitating the business and avoiding getting each note and renewal thereof indorsed by the directors, upon a resolution offered by Mr. Jones, a bond was given to the bank, with certain of the directors as sureties (among whom was J. Huff Jones), under which the secretary was authorized to negotiate and discount paper at the Home Savings Bank for the company to the

amount of $20,000 during the ensuing year; that on May 22, 1891, the amount of the bond was increased to $30,000. At the expiration of the first bond a second one was given for like purpose on September 13, 1891. A third one was given September 13, 1892. This last bond is in like form as the others, for $30,000, and, among other things, recites:

" *Whereas,* for the successful and more advantageous management of the trade and business of the said corporation, it is necessary, from time to time, to borrow money to an amount not exceeding $30,000; and

"*Whereas,* for that purpose, Francis A. Blades, the secretary of said corporation, has, by resolution of the board of directors thereof, been, and is hereby, duly authorized and directed to make or indorse negotiable paper of or for such corporation for such loans, from time to time, during the next ensuing 12 months, as he may find necessary to carry on the business of said corporation, not exceeding in the aggregate the amount of $30,000, upon the promissory notes of said corporation, or such commercial or business paper as said Francis A. Blades may discount at said Home Savings Bank upon the indorsement of said corporation or otherwise; and

" *Whereas,* the above-bounden obligors have consented, and do hereby consent, to become security, jointly and severally, for the payment of such indebtedness in accordance with the terms of the negotiable paper issued or to be issued and discounted as aforesaid, and that this, their bond, shall stand as security therefor in the hands of the obligee above named, for the benefit of the holders of any such paper:

"*Now, therefore,* the condition of this obligation is such that, if the Detroit Motor Company shall well and truly pay or cause to be paid and discharged all the indebtedness to be evidenced by the commercial paper which has been or may hereafter be issued and discounted, as above provided, then this obligation to be void; otherwise to remain in full force and virtue."

This bond was signed by the directors of the company, including J. Huff Jones. After its execution and delivery, the Home Savings Bank renewed certain notes given under the former bonds, and discounted for the Detroit

Motor Company certain promissory notes which were secured by this last bond.

J. Huff Jones died December 16, 1892.    At this time the discounts amounted to $30,000.    After his death, and after the bank had knowledge of it, a large part of the paper so held by the bank was renewed by it.    The notes for which the renewals were taken were in each case surrendered by the bank at the time of the renewals; but no paper was renewed by the bank after September 13, 1893, the date at which the said bond was to expire according to its terms.    None of these notes or the renewal notes have been paid, and they amount in the aggregate to $30,600.81.

The court found further as follows:

" I specially find that J. Huff Jones and the other sureties on said bonds were the principal stockholders, officers, and directors of the Detroit Motor Company at the time said bonds were given; that it was the intention that the bank should loan to said Detroit Motor Company the amount of money named in said last bond, not for the ordinary short time of banking paper, but for such indefinite period as might be required in the company's business, and that the same was intended as a permanent loan during the life of said bond; that the said bank had already so loaned large amounts during the two previous years under the first two bonds; that a large part of the indebtedness under the last bond — the one in question — had been incurred under the former bonds; that said former bonds had been for one year each, like the one in question in this case.    Also that all the parties, the Home Savings Bank, the Detroit Motor Company, and the sureties on the last bond, — the one in question, — contemplated that, although the loan of money by the bank would be, in form, upon the comparatively short-time paper customary to a bank, yet, in effect, the Detroit Motor Company and the sureties on the bond were bound for such renewals or extensions as might be required by the company's business during the term of said bond.

"That the Home Savings Bank never, in terms, agreed that it would loan to the Detroit Motor Company the amount of $30,000, mentioned in the last bond set forth in finding 1, nor any other sum, and never, in terms, agreed

that it would continue any of its loans beyond the period specified in the notes taken upon said loans, and made no agreement respecting said loans except that implied by the acceptance of the bond in question, and by the course of business under the previous bonds and the one in question, and gave no consideration for said bond other than that shown by the facts hereinbefore found.

"Based upon the foregoing, I find as conclusions of law:

"1. That J. Huff Jones could not revoke his liability on said bond during his lifetime; that at the time of his death, on December 16, 1892, he was liable under said bond to the full amount thereof.

"2. That the death of said J. Huff Jones did not operate as a revocation of his liability under said bond during the year for which the same was given.

"3. That the taking of renewal paper by the Home Savings Bank after the death of J. Huff Jones, and notice thereof, and before the expiration of said bond on September 13, 1893, was not in law such a payment as released his estate from liability thereon under the terms and conditions of the bond, and the purpose the parties had in view in giving and renewing the bond. I also hold as a matter of law that it was not contemplated by the sureties that each renewal of the notes should constitute a fresh indebtedness, but, on the contrary, it was the intention of all the parties to continue the indebtedness indefinitely, which was not extinguished because of any change in the commercial paper held by the bank by the renewal or extension of notes.

"4. That the Home Savings Bank is entitled, by reason of the foregoing facts, to recover from the estate of J. Huff Jones the entire amount due on said notes, Exhibits 2, and 4 to 24, both inclusive, as allowed by the commissioners on claims against said estate, which, with the interest to the date of their report, amounted to $30,600.81, and from which date interest should run thereon."

A certain note was also presented to the commissioners on claims for allowance against the estate. The court found upon that as follows:

"1. On or about January 15, 1891, the Home Savings Bank discounted for, and placed the proceeds to the credit of, the Detroit Motor Company, a note, of which the following is a copy:

" '$5,000.00.                              DETROIT, January 15, 1891.
" 'On demand after date the Detroit Motor Company promises to pay J. Huff Jones, F. A. Blades, E. T. Hance, L. Van Derburg, Wm. C. Maybury, H. K. Jones, T. B. Rayl, Charles W. Casgrain, or order, five thousand dollars, at the Home Savings Bank, value received, with interest seven per cent. per annum.

" 'DETROIT MOTOR CO.,
" 'By F. A. BLADES, Treas.'

'Indorsers on back:  · WM. C. MAYBURY, ELLWOOD T. HANCE, J. HUFF JONES, T. B. RAYL, L. VAN DERBURG, HENRY K. JONES, F. A. BLADES, and CHARLES W. CASGRAIN.' Interest indorsements: [Herein are enumerated various interest items.]  *  *  *

"2. The indorsers on said note, with the exception of L. Van Derburg and Henry K. Jones, were the same persons as the sureties on the bond hereinbefore set forth.

"3. The interest was paid on said note quarterly from its date until January 15, 1893, during all of which time I find that said note was treated and intended as a permanent loan; that J. Huff Jones was a director and vice-president of the Detroit Motor Company, and knew that this loan was made, and was familiar with the .business of the Detroit Motor Company, as set forth in the general findings herein. I further find that, owing to his official business relations to the Detroit Motor Company, he was not a mere accommodation indorser on said note, but that he signed said note for the purpose of procuring from the Home Savings Bank a permanent loan of the amount of said note to the Detroit Motor Company.

"4. I further find that said note was duly presented at the Home Savings Bank, and. demand made for payment of said note, on July 24, 1893, and, on failure of payment upon such demand, was duly protested on said day.·

"5. I also find that through the spring previous to said presentation, demand for payment, and protest of said note, the cashier of the Home Savings Bank had a number of times spoken to F. A. Blades, secretary of the Detroit Motor Company, about said note, and requested him to come in and take care of the note; that during said time F. A. Blades was the secretary and principal financial manager of the Detroit Motor Company; that these requests were made at the bank, and that the note was then in the bank.

"6. I also find that on or about June 16, 1893, certain letters were mailed by the Home Savings Bank, and received· by the parties addressed, of which the following are copies:

" 'DETROIT, MICH., June 16, 1893.

" 'F. A. BLADES, City.

" '*Dear Sir:* Our board of directors require immediate payment of demand loan for $5,000, made January 15, 1891, by Detroit Motor Company, and indorsed by you.

" 'Respectfully yours,

" 'J. H. HAASS, A. C.'

" 'DETROIT, June 16, 1893.

" 'J. HUFF JONES' EXECUTORS, City.

" '*Gentlemen:* Our board of directors require immediate payment of Detroit Motor Company demand note, dated January 15, 1891, for $5,000, indorsed by Mr. J. Huff Jones.

" 'Very truly yours,

" 'J. H. HAASS, A. C.'

"Also that similar letters were on the same day sent to and received by the Detroit Motor Company and the other indorsers of said note.

"7. I also find that the conversations aforesaid between the cashier of the bank and the secretary of the Detroit Motor Company, and the letters aforesaid, were not, in my opinion, anything more than requests to arrange for payment of the note; that they did not, in law, amount to a formal demand for absolute payment, but that the intention of the bank was thereby to call the attention of the parties to the fact that the bank desired arrangements to be made for payment; and I consequently find that the only time any actual presentation and demand for payment of the note was made was on the day of protest thereof.

"From the foregoing facts I find as conclusions of law that the Home Savings Bank is entitled, by reason of the foregoing facts, to recover from the estate of J. Huff Jones the entire amount of said note as allowed by the commissioners on claims, to wit, $5,889.91, that being the amount due thereon at the date of filing the report of said commissioners on claims, from which date interest is to run thereon."

Certain amendments were asked to the findings, which were refused, and exceptions were taken, as well as exceptions to the findings of fact and law as made.

1. It is contended by counsel for defendants that the bond was nothing more than an offer to the bank to guarantee paper discounted by it within a year from date,

and before revocation of the guaranty; that, as to discounts of paper from time to time before revocation, the obligors became liable therefor, but that any obligor might, at any time within the year, notify the bank that he would not be liable for discounts made thereafter; that the death of Mr. Jones, and notice thereof to the bank, had the same effect as a notice that he would not be liable for future discounts, given by him in life, would have had; and that his estate could not be held upon paper thereafter discounted, whether loans or renewals. It is also contended that the fact that Mr. Jones and the other signers of the bond were stockholders and officers in the Detroit Motor Company, and that the paper was discounted for the company, could not affect the question as to whether the instrument at its delivery became an irrevocable guaranty for the full time and amount, thus making the liability of the parties thereto different from what it would be if they were not stockholders in the Detroit Motor Company. On the other hand, it is the contention of counsel for the claimant bank that the bond, upon execution and delivery, became an irrevocable guaranty of all paper, to the amount of $30,000, that the bank might discount for the company during the year; that the right of the bank to discount such paper, and hold the obligors thereon, could not be affected by any notice of revocation, nor by the death of the obligors.

After a careful examination of the authorities cited and other authorities found on the subject, we conclude that the safe rule, and the one supported by the best-reasoned cases, is that the instrument must have that effect which shall best accord with the intention of the parties as manifested by the terms of the guaranty, taken in connection with the subject-matter to which it relates. As was said in *Mussey* v. *Rayner*, 22 Pick. 227:

"The next inquiry is, Was this a continuing guaranty? The defendant insists that upon this point a strict rule of construction should prevail, and that it ought to appear unequivocally that it was the purpose of the defendant to

guarantee the payment of debts contracted by Mr. Rayner, Jr., from time to time. Such a rule has often been stated by eminent jurists. *Mason* v. *Pritchard*, 12 East, 227; *Cremer* v. *Higginson*, 1 Mason, 336; *Russell* v. *Clark's Ex'rs*, 7 Cranch, 69. On the other hand, there are authorities countenancing the doctrine that a liberal construction is to be given in such cases in favor of a person claiming rights under such a guaranty, and holding it to be the duty of the guarantor to limit his guaranty expressly to a single dealing if he would avoid a further responsibility. Thus, in the case of *Merle* v. *Wells*, 2 Camp. 413, where Lord Ellenborough says: 'If a party means to be a surety only for a single dealing, he should take care to say so.' Probably the better rule of construction would be that applied to other contracts,—to give the instrument that effect which shall best accord with the intention of the parties as manifested by the terms of the guaranty, taken in connection with the subject-matter to which it relates, and neither enlarging the words beyond their natural import in favor of the creditor, nor restricting them in aid of the surety."

This is the rule laid down in 1 Brandt, Sur. (2d Ed.) § 156, in which it is said:

"The true rule for construing guaranties is to give effect to the intention of the parties as expressed in the instrument, read in the light of the surrounding circumstances."

Willes, J., in *Heffield* v. *Meadows*, L. R. 4 C. P. 595, in deciding whether a guaranty was continuing or not, said:

"It is obvious that we cannot decide that question upon the mere construction of the document itself, without looking at the surrounding circumstances to see what was the subject-matter which the parties had in their contemplation when the guaranty was given. It is proper to ascertain that for the purpose of seeing what the parties were dealing about; not for the purpose of altering the terms of the guaranty by words of mouth passing at the time, but as part of the conduct of the parties, in order to determine what was the scope and object of the intended guaranty. Having done that, it will be proper to turn to the language of the guaranty, to see if that language is capable of being construed so as to carry into effect that which appears to have been the real intention of both parties."

In *Columbus Sewer-Pipe Co.* v. *Ganser*, 58 Mich. 385 (55 Am. Rep. 697), the plaintiff claimed that the bond sued upon contained a continuing guaranty. The rule laid down in Brandt on Suretyship was applied. It was said that "showing the circumstances under which the contract is made, and the subject-matter to which it relates, does no more than aid the court and jury to better understand the true sense in which the words are used and understood by the parties." See, also, *Bell* v. *Bruen*, 1 How. 187; *Weed Sewing-Machine Co.* v. *Winchel*, 107 Ind. 260; *Grocers' Bank* v. *Kingman*, 16 Gray, 473.

In the light of this rule, what construction is to be placed upon this bond? It is admitted that notice of revocation would not affect the liability of the obligors upon previous discounts. The bond itself recites that the "obligors are stockholders and interested in the business of the Detroit Motor Company;" that, "for the successful and more advantageous management of the trade and business of said corporation, it is necessary, from time to time, to borrow money to the amount of $30,000;" that "the secretary has, by resolution of the board of directors, been, and is hereby, duly authorized to make or indorse negotiable paper of or for such corporation for such loans, from time to time, *during the next ensuing 12 months*, as he may find necessary to carry on the business of said corporation, not exceeding in the aggregate $30,000." It also recites that the "obligors have consented, and do hereby consent, to become security, jointly and severally, for the payment of such indebtedness in accordance with the terms of the negotiable paper issued or to be issued and discounted as aforesaid." It thus appears from the bond that the Detroit Motor Company was without cash capital to operate its business; that the obligors on the bond were its stockholders and directors, and interested in the successful management of the business. They recognized the necessity of borrowing money to carry on the business. They made a forecast of the needs of the business for the ensuing year, and concluded that it would require $30,000,

and took this method of borrowing the amount decided upon; and the bond contemplated that the business should be carried on during that 12 months without interruption. This was evidently the construction put upon it by all the parties, as shown by their previous dealings under other and similar bonds.

It is conceded by counsel for defendants that the obligors might, doubtless, have made themselves liable, as claimed by the bank, had the bank parted with any valuable consideration, but the contention is that, when the bond was given, no consideration passed; that the fact that the bank had previously discounted paper of the company does not affect the question; that a past consideration will not support a present agreement. It is not the mere fact that the bank had discounted paper of the company, which it still held at the time this third bond was given, but the fact that the bank held the second bond as security for the paper which it had previously discounted, and then held, and refused to continue the loan unless a new bond was given. Undoubtedly, payment of the paper would have been required had not the new bond been given. This was not only a contract between the company and the bank, but also a contract between the sureties themselves, who were stockholders and interested in the continuance of the business. It was a contract, under the findings of the court below, in which the entire consideration of $30,000 passed at the time of the acceptance of the bond and the surrender of the former bond, and, under well-settled rules, could not have been revoked by the obligors, and consequently was not revoked by the death of Mr. Jones. That finding by the court has been fully set out. It is supported by the facts and circumstances surrounding the case. It was the intent of all the parties that this business should continue for the entire time fixed by the bond, and it was not contemplated that any one of the obligors might give notice and terminate the arrangement made with the bank to discount and renew paper.

It is the general rule that when the engagement of a surety is a contract, and not a bare authority; it is not usually revoked by his death, and his estate remains liable the same as he would have been had he lived. Whether one undertakes for himself or others in regard to future transactions, the contingency that death may remove him before the obligation can be fulfilled must be regarded to be in the contemplation of the parties, and that the obligation will be unaffected by that event.  1 Brandt, Sur. (2d Ed.) § 133; *Green* v. *Young*, 8 Greenl. 14 (22 Am. Dec. 218); *White's Ex'rs* v. *Com.*, 39 Pa. St. 167.

In *National Exchange Bank* v. *Gay*, 57 Conn. 224 (4 L. R. A. 343), which counsel for defendants cite, it appeared that the bond, by its terms, did not provide for carrying on the business for a definite time, and it expressly provided for revocation on notice by any one of the obligors at any time.   In *Gay* v. *Ward*, 67 Conn. 147 (32 L. R. A. 818),— a suit for contribution on the same bond as in the former case,—the court held that it was a continuing guaranty, which covered all renewals, substitutions, and extensions made while the contract was in force.   In discussing the question of revocation, the court held that, unless its terms forbade it, the contract of continuing guaranty might be revoked on notice to the guarantee.   The court also held that the bond was revocable for the reason that it contained a specific reservation to the sureties that they might cancel their liability by giving notice, and that the death of any one of the sureties, so far as his estate was concerned, operated the same as the notice provided for in the bond itself; but the court added:

"The question whether a guaranty will be revoked by notice of death, when, by the terms of the guaranty, the guarantor could not, in life, have revoked the guaranty, is not before us, and we express no opinion upon this point."

It is evident, therefore, that these cases have no weight in determining the question here involved.

The court below very properly held that, from the terms of the bond and the surrounding circumstances, the bond was not revoked by the death of Mr. Jones. It stood as a continuing guaranty for one year from its execution and delivery, and the bank had the right to discount and renew paper for the company up to the time of its expiration; and the sureties on the bond, including the estate of Mr. Jones, must be held liable therefor.

2. The other claim is on the $5,000 note indorsed by Mr. Jones and others. The defense to this note is based upon the grounds:

*First.* That it was the duty of the bank, in order to hold the indorsers upon the note, to present it for payment within a reasonable time, which time would be much shorter than that which actually elapsed before presentment, and that that delay was such laches as to discharge the indorsers.

*Second.* That the indorsers are discharged because the bank did not notify them of the failure of the Detroit Motor Company to pay, and that no notice was given to them of the demands made verbally upon the company in the spring of 1893, or of the demand by letter on June 16, 1893

Upon the first point, counsel for the bank contends that the note was a continuing security, upon which the indorsers remained liable until presentment, however long the time which might elapse before it was presented, in view of the fact that the court below found it to be a permanent loan. Exception was taken by defendants' counsel to this finding, and it is now claimed that there was no evidence to sustain such finding.

The testimony is returned in the bill of exceptions. The findings show that the note was given January 15, 1891; that no demand of payment was made, or notice of such demand given, until July 24, 1893. We find no testimony in the record which warranted the finding that this was regarded as a permanent loan. Mr. Ellwood T. Hance, one of the indorsers on the note, and one of the directors of the Detroit Motor Company, was called as a witness

for the claimant, and testified on cross-examination that, if the note had been presented in 1891, it would have been paid; that the financial difficulty came upon the company in the latter part of 1892. The note must, therefore, be treated as an ordinary demand note, and the rights of the parties settled by the rules applicable thereto. The cases are at variance upon this rule. The court of appeals of New York held in *Merritt* v. *Todd*, 23 N. Y. 28 (80 Am. Dec. 243), that a promissory note payable on demand, with interest, is a continuing security, and that an indorser remains liable until an actual demand; that the holder is not chargeable with neglect in omitting to make a demand within any particular time. This case has since been criticised, not only by other courts, but by that court; and in *Parker* v. *Stroud*, 98 N. Y. 385 (50 Am. Rep. 685), that court said:

" Since the case of *Merritt* v. *Todd*, no determination contrary to the principles there laid down has been made in this State, and, although that decision has been somewhat criticised in later cases, it has now been acquiesced in too long as the law of the land to be open to question or dispute."

This doctrine has not been followed in other States, and the great weight of authority is that demand notes must be presented for payment within a reasonable time, and, in case of nonpayment, notice must be given as in other cases to indorsers.

In *Perry* v. *Green*, 19 N. J. Law, 61 (38 Am. Dec. 536), the question was squarely presented. The action was upon a promissory note for $2,000, dated June 2, 1835, payable on demand, with interest. There was no demand of payment until March 19, 1839. Plaintiff claimed that it was understood between the parties that it was to be a permanent loan, though there was no time of payment agreed upon except as expressed in the note. The court, in stating the case, said that, if there had been any agreement as to the time when the note should be paid, it could not affect the rights of the indorser unless

he was a party to the agreement; and even then it might well be doubted whether parol evidence of any agreement to extend the time of payment, thus altering the force of the written contract, would be admissible. The note was transferred to the plaintiff for money borrowed. Some contention was made that, the note being payable with interest, it was thereby taken out of the rule applicable to commercial paper. It was said that it was a note upon which immediate payment might be demanded; that the indorser contemplated a short credit, and that that was the consideration upon which he agreed to be responsible; that if it was the object of the borrower to effect a permanent loan, and a protracted day of payment was in the contemplation of the parties, a corresponding note would have been drawn, and that the borrower would not have put it in the power of the owner of the note to call upon him immediately for payment. It was held that the demand should have been made earlier, and that the judgment should have been directed for defendant.

In *Field* v. *Nickerson*, 13 Mass. 131, the note was payable on demand, with interest. It was given for money loaned. The action was against the indorser. No demand was made for eight months; and it was held that it should have been made earlier. The cases of *Rice* v. *Wesson*, 11 Metc. (Mass.) 400, *Thielman* v. *Gueble*, 32 La. Ann. 260 (36 Am. Rep. 267), *Turner* v. *Iron Chief Mining Co.*, 74 Wis. 355 (5 L. R. A. 533, 17 Am. St. Rep. 168), are all to the same effect. In the last case the court said:

"It has been held in New York, and perhaps elsewhere, that an indorsed promissory note, payable on demand, with interest, is a continuing security, on which the indorser will remain liable until an actual demand, and upon which the holder is not chargeable with neglect for omitting to make demand within any particular time. *Merritt* v. *Todd*, 23 N. Y. 28 (80 Am. Dec. 243). But much of the reasoning in that case seems to have been disapproved by subsequent cases in the same court. * * * The case of *Merritt* v. *Todd* has been expressly re-

pudiated in Louisiana, where it is held that a demand note must be protested, and notice given within a reasonable time, to hold an indorser; and the fact that the indorsement was for accommodation, and that the note bears interest, makes no difference. *Thielman* v. *Gueble*, 32 La. Ann. 260 (36 Am. Rep. 267). This ruling seems to be in harmony with the current of authority in this country, as appears from the valuable notes by Mr. Freeman in 80 Am. Dec. 250–254."

The delay in the above case was 10 months. The case was followed and approved in *Leonard* v. *Olson*, 99 Iowa, 162 (35 L. R. A. 381, 61 Am. St. Rep. 230).

In *Palmer* v. *Palmer*, 36 Mich. 490 (24 Am. Rep. 605), the court said, in speaking of demand notes:

"If the note had been negotiable, and indorsed over, any long delay to present it would unquestionably have released the indorser.   *   *   *   It is now well settled that a note payable on demand is payable at once, and without demand, so that the statute runs from its delivery; and this rule has been applied where, from the form of the contract, it is manifest that immediate payment was not expected. Thus, in *Norton* v. *Ellam*, 2 Mees. & W. 461, the note called for interest, which indicated at least an expectation of some delay."

In that case the action was on a note payable 30 days after demand, and it was held that it was barred by the statute, as against the maker, after the lapse of 6 years after the 30 days named in the note.

The courts are sometimes embarrassed with the question whether the time when demand is made, under the circumstances of the given case, is a reasonable time. In the present case, however, no such embarrassment arises. The parties all resided in the same city, so that the bank could have presented it at any time to the company, and notified the indorsers; and yet it carried it from January 15, 1891, to July 24, 1893, over 2½ years from its date, before taking any legal steps to demand payment or notify the indorsers. The demand was not made within a reasonable time to hold the indorsers on this paper. We need not, therefore, discuss the question as to the sufficiency of

the demand and notice. This item of the claim should not have been allowed by the court below.

The judgment of that court must be modified in accordance with these views, and, as modified, will be affirmed. Defendants will recover costs of this court.

The other Justices concurred.