BORDEN v. FLETCHER'S ESTATE.

1. STATUTE OF LIMITATIONS—PART PAYMENT—NEW PROMISE.
   The theory on which part payment of a debt arrests the run-
      ning of the statute of limitations is that it implies a new
      promise to pay; and a payment made under circumstances
      inconsistent with such an inference is ineffective.

2. SAME—JOINT DEBTORS.
   A payment by a joint debtor will not arrest the running of
      the statute as to his co-debtor.   3 Comp. Laws, § 9745.

3. SAME—PARTNERSHIP.
   And the fact that the debtors were copartners can make no
      difference, if the partnership had been dissolved at the time
      of the payment.

4. SAME—PRINCIPAL AND SURETY.
   Letters written by a surety on a note, in form a joint maker,
      to his principal, at the request of the payee, urging that a
      payment be made on the note, and expressing his own desire
      to the same effect, do not make the surety a party to pay-
      ments made by the principal in compliance therewith, so as
      to deprive him of the benefit of the statute of limitations.

5. SAME—ACKNOWLEDGMENT OF DEBT.
   Nor are the letters such an acknowledgment of a continuing
      obligation, within 3 Comp. Laws, § 9740, as will take the case
      out of the statute.

6. CONTRACTS—CONSTRUCTION—PAROL EVIDENCE.
   Parol evidence is admissible to aid in arriving at the intention
      of parties in the use of equivocal words in a contract.

7. SAME—PRINCIPAL AND SURETY—EXTENSION OF TIME.
   In an action against a surety on a note which bears his in-
      dorsement, written after maturity, consenting to "any exten-
      sion of time" that might be given the maker, evidence that
      the surety, in refusing to renew the indorsement, stated that
      it was as good as though he should sign it again, is admissible,
      as tending to show the light in which the parties regarded
      the agreement, which was susceptible of meaning either a
      technical extension, or forbearance and successive indul-
      gences.

8. SAME—CONSIDERATION.

   A surety's consent to the granting of indulgence to his princi-
      pal cannot be said to have been without consideration, where
      the principal has had the benefit thereof.

Error to Kent; Wolcott, J.    Submitted April 25, 1902.
(Docket No. 139.)    Decided June 24, 1902.

Eliza A. Borden, by Frances B. Eby, her guardian,
presented a claim against the estate of Niram A. Fletcher,
deceased, upon a promissory note.    From a judgment for
defendant on verdict directed by the court, claimant brings
error.    Reversed.

*H. B. Fallass,* for appellant.

*Knappen, Kleinhans & Knappen,* for appellee.

HOOKER, C. J.    The appellant presented a claim
against the estate of Niram A. Fletcher, deceased.    It
was based on a promissory note for $2,500, with interest
at 8 per cent., dated December 29, 1881, due two years after
date, and signed "Simonds & Fletcher."    A number of
unsigned indorsements of payments were written on its
back; also the following:

"Feb. 1, '87.    I consent to any extension of time which
may be given to O. H. Simonds on the within note.
                                     "N. A. FLETCHER."

The defendant answered, among other things, that the
note was barred by the statute of limitations, and the pro-
bate court so held, as did the circuit court upon appeal, a
verdict being directed for the defendant.    Plaintiff has
taken a writ of error.

Five points are raised by the appellant's counsel, viz.:

*First.* Was Mr. Fletcher a party to the payments made,
and within six years?

*Second.* Did Mr. Fletcher acknowledge the debt in
writing within six years of his decease, and within the
meaning of the statute of limitations of the State of Mich-
igan?

*Third.* Was the term "extension," used by Mr. Fletcher on the back of the note, intended to mean indulgence, and intended for an indefinite length of time?

*Fourth.* Were the statements of Mr. Fletcher to Mr. Sessions, that he was "as much holden as he possibly could be," of such a nature that it would operate as a fraud to hold them to have been false? In other words, is Mr. Fletcher estopped from denying that he told Mr. Sessions the truth?

*Fifth.* After all parties knew of Mr. Fletcher's suretyship, did he remain a joint maker, within the meaning of the statute, so that a payment by the principal would not renew the paper as to him?

For a better understanding of the several points, we will state the facts in connection with the discussion of the questions raised.

The note in question was given when Simonds and Fletcher were in copartnership. Subsequently they dissolved their copartnership, and Simonds left the State. There seems to be no doubt that, as between them, it was afterwards the duty of Simonds to pay the note, and that this was understood by the payee. Counsel for the plaintiff states in his brief: "Now, Mr. Fletcher was a party to this note, and was a surety after the dissolution." The note became due on January 1, 1884, and the statute ran against it in six years, *i. e.*, January 1, 1890, except as it may have been affected: *First,* by Simonds' non-residence; *second,* by payments; *third,* by new promises.

The record is not very clear as to the circumstances of the various payments; yet counsel seem to concede that they were made as indorsed on the note, and that Simonds furnished the money paid in each instance. Whatever the rule may have been at common law (see *Mainzinger* v. *Mohr,* 41 Mich. 687 [3 N. W. 183]), our statute has provided that no joint contractor shall lose the benefit of the statute of limitations, so as to be chargeable, by reason only of any payment made by another joint contractor. 3 Comp. Laws, § 9745. And if it should be claimed that payment made by one copartner would bind another, upon the ground of his agency growing out of the copart-

nership relation, it could not apply here, under our statute, because of the termination of the agency by the dissolution of the copartnership.   13 Am. & Eng. Enc. Law (1st Ed.), 761, and authorities cited.

It is contended, however, that Fletcher was a party to such payments in a way and to a degree that makes him liable.   The theory upon which a part payment arrests the running of the statute is that it implies a new promise to pay; and a payment made under circumstances inconsistent with such an inference is not effective.   See Wood, Lim. § 97, and notes.   In *Mainzinger* v. *Mohr*, 41 Mich. 687 (3 N. W. 183), the statute is construed, and the doctrine stated that the statute requires a new promise, and that it cannot be implied from the act of one who has not authority to make an express promise.   In that case an undisclosed surety, who was a joint maker, went with the principal to the creditor, where the money was paid by the principal under circumstances which justified the creditor in understanding such payment to be the act of both and treating it as a joint act; but the case does not negative the general rule that a new promise must be naturally inferable from the circumstances of the payment, a doctrine that has since been recognized in the cases of *Home Life-Ins. Co.* v. *Elwell*, 111 Mich. 689 (70 N. W. 334), and *Patterson* v. *Collier*, 113 Mich. 12 (71 N. W. 327, 67 Am. St. Rep. 440).

Several letters which passed between Fletcher and Simonds were introduced at the trial, and it is claimed that these contain evidence that the payments were made under circumstances which implied a new promise by Fletcher.   These letters were usually written either at the request of the payee, or after demand of payment made to Fletcher by him.   It does not appear that any of these letters were written to the payee, or that he ever saw them.   One written by Fletcher to Simonds on February 6, 1885, states that "Borden has been bothering me about the interest on your note," and states that "if he had any

Simonds & Fletcher funds on hand he would pay it." On February 9, 1886, he wrote:

"Mr. Borden has been in a great many times lately, urging me to write to you, asking that something be paid on your note. I have delayed doing so until now, and I could not put him off any longer."

On December 11, 1888, Simonds wrote Borden as follows:

"DULUTH, MINN., Dec. 11th, 1888.
"ANDREW BORDEN,
          "Jefferson Ave.,
                    "Grand Rapids, Mich.
"*Dear Sir:* I understand Fletcher paid you $500 on my account. If so, please write me, giving date, and say that it is indorsed on my note."

In answer to this, Mr. Fletcher wrote as follows:

"Dec. 17th, 1888.
"*Dear Omar:* Mr. Borden brought your letter to him, and asked me to answer it. I paid the $500 to him on the 3d day of December, and indorsed the amount on the note myself. He seems to be in very good humor, and wanted me to send you his kindest regards, and said that he wished you much prosperity."

The following is an extract from a letter written by Fletcher to Simonds on January 21, 1891:

"Mr. Borden was in here about two weeks ago, and asked me to write you requesting you to send him some money. He did not name the amount. I promised to do it, but forgot it. He was in to see me again today, to know what reply you had made, and I told him frankly that I had forgotten to write you at all, but that I would be sure to write you today. I do not think that he feels at all uneasy, or that he cares for any great amount. If it is not convenient for you to pay him any just now, I . believe if you should write him a letter to that effect, he would say to let the matter run."

On June 15, 1891, Fletcher wrote:

"*Dear Omar:* I inclose Beckwith's computation on the Borden note. He says that he found a mistake in the computation of interest made in February, 1886, in which

a mistake of over $100 against you was made.    He thinks that this computation is now right, but you have the figures, and can go over it and satisfy yourself about it."

On October 16th he wrote the following:

"*Dear Omar:*    Andrew Borden called on me today, and said that he expected you to send him a new note for amount his due after you received the computation which Mr. Beckwith made and which I sent you.    He is anxious to get it, and wanted me to write you at once."

On October 22, 1891, Simonds sent note to Fletcher as requested, and Fletcher replied on October 24th, as follows:

"*Dear Omar:*    I have received your letter of October 22d, with note for $1,077.96 for Andrew Borden, and I will deliver it to him.    I do not see why you made it draw 8 per cent. interest, because I think he would have been willing to have let you have it at 7 per cent."

On March 31, 1892, Fletcher wrote as follows:

"*Dear Omar:*    Since you sent me a note last summer to take up Borden's old note, I have never met him in the office until this morning.    You will remember that you sent me one bearing 8 per cent. interest, and that I asked you to send another bearing 7 per cent., as I thought he would be satisfied with that. · It seems that I kept them both.    I now cancel and return them to you.    Mr. Borden has figures from Mr. Beckwith showing much larger sum due than these notes call for, and I said to him that I would write to you and ask you to return me the computation which Beckwith made, and which I sent to you. I will keep it here, and when you come we will make a new note for him, and take the old one up.    Please send the computation, and write me telling me when you are likely to be here, and what the news in Duluth is."

The computation was returned, and on April 30, 1892, Fletcher wrote to Simonds that "it was clear that Beckwith had made a mistake in his computation," and sent *data* from which Simonds could make a computation, expressing the opinion that Borden's computation was correct.    He added:

"Borden wants a new note, and he suggests that he

would be glad to have some cash to reduce the amount. He insists on the note drawing 8 per cent. interest."

Fletcher also wrote the following:

"Sept. 15th, 1892.

"*Dear Omar:* Mr. Borden and his daughter came in here a few days ago, and asked me to write to you requesting a remittance of such amount as you could spare. I urged him to do the writing himself, but he seemed very anxious that the letter should go from me. I promised him to write immediately, but it slipped my mind, and I am now at least four or five days behind time."

"Jan. 6th, 1894.

"*Dear Omar:* Rodney Sessions came in here this afternoon for Mrs. Borden, and said she seemed to be very much exercised about the interest on her note, and had been telling him that, if the interest was not paid promptly, she would demand the principal. I explained to him that the delay in forwarding the other notice to you was owing to neglect on my part. Mr. Sessions said that, if the interest was taken care of promptly, he would use his influence with her to have the principal remain as it is for a time. I wish you could send her some money at once."

"Jan. 29th, 1894.

"*Dear Omar:* I return the note for $1,000 of the Calumet Construction Company, dated November 23d, 1893, which I paid here on the 26th.

"I wrote a letter, and directed it to Chicago, warning you against Edward R. Gilman, and calling your attention to the fact that Mrs. Borden has received no remittance from you. Sessions came in today, and said that she was very angry about it, and was insisting on collecting the note in full, but through his persuasion she had been held off. He says that if a good remittance does not come at once she will not wait longer. You wrote me on the 9th of January that you would send a remittance in a few days."

There is nothing in these letters that can be construed into a new promise to pay this note. It is perhaps inferable (though not clear) that demands of payment and threats of suit were made of and against Fletcher, and that Fletcher, at the instance and request of Borden, in some instances, and perhaps for his own protection, urged

Simonds to pay the note, and sought to arrange for new paper, and in one instance said in a letter to Simonds, "We will make a new note for him, and take the old one up." If this could be given the force of a similar statement made in a letter to Borden, and it could be held sufficient to arrest the running of the statute even if it were written to him,—which we do not intend to intimate, —the letter seems to have been written more than six years before the claim was filed, and is for that reason ineffective. We have been unable to find just when Mr. Fletcher died, but it is stated in appellant's brief that the last payment was made in 1899 (August 24th), and that Fletcher died afterwards, and promises made or letters written before August 24, 1893, would not, therefore, be effective to meet the defense; and this enables us to eliminate all of the letters except those of January 6 and January 29, 1894, so far as the question of payment is concerned, neither one of which contains the semblance of a promise, though the earlier expresses a wish that Simonds would make a payment at once. Payments were made a month or so later by Simonds, and it is perhaps not unreasonable to say that they were made at the request of Fletcher.

It seems to be conceded that payments were made as per the indorsements. The evidence is silent as to who paid the money over, though we understand it to be claimed that all was paid by Mr. Simonds after October 17, 1892, on which occasion a payment of $250 was received from or through Mr. Fletcher, according to the testimony of Mrs. Eby, and possibly that should be treated as a disputed fact if it were important. The only evidence that can be said to connect Fletcher with payments made within six years before Fletcher's death consists of the last two letters. From them we may infer that the money was sent by Simonds to the creditor by reason of the threat contained in the latter letter, and the request of Fletcher as shown by the former. These two letters contain all the evidence of a new promise by Fletcher inferable from pay-

ments made within six years before the death of Fletcher, which occurred after August 24, 1899. They and they alone show the circumstances of the payments. Stated in its most favorable light for the plaintiff, was a payment by Simonds, induced by the request of Fletcher, one which the creditor had a right to treat as a payment made by Fletcher?

The day has gone by when it can be held that a mere payment by one joint maker of a note can arrest the running of the statute as against another. Our statute (3 Comp. Laws, § 9745) has changed the common-law rule, and as was said in *Mainzinger* v. *Mohr*, 41 Mich. 687 (3 N. W. 184):

"A payment under this statute is equivalent to a new promise; and, as one cannot make the express promise for the other, neither can he make for him the indirect promise which a payment implies."

It is only when authority is given to one to make a payment on behalf of another that such payment can bind a co-contractor of him who makes the payment. Where it can be said that the payment is the act of both, and the creditor has reason to so understand it from the fact that both principal and surety are present and participate in it, there being nothing to inform him that the money paid was not furnished in whole or in part by the surety, it has been held that the case must be looked at from the standpoint of the creditor, and in the light of the appearances as they were then presented to him. Such was the case of *Mainzinger* v. *Mohr*, *supra*, where it was said that:

" The debtors came together [to the creditor's place of business]; their sole business was the payment of interest on his demand; it was reckoned up, paid, and credited in the presence and with the apparent co-operation of both. Naturally, he would suppose that the money paid was the money of the one who, as between himself and his creditor, ought to pay it; but he was only concerned with the fact that what they did was by co-operative and conjoint act. He had, therefore, a right to understand that this was a mutual payment, and that the parties thereby

mutually renewed their promise of payment. If Main-
zinger, at the time, had in his own mind any purpose to
consider and treat the transaction as being something
different from what the appearances indicated, it was his
duty to notify Mohr *that Miller alone was making the
payment, and Mohr would then have been put on his
guard*, and would have had only himself to blame if he
had lost his remedy by subsequent delay."

The present case is not so strong a case for the plaintiff
as the one discussed. Fletcher did not go with Simonds
to pay the money, and, so far as we can discern, there
was nothing that would lead the creditor to believe that
the money was furnished or paid by Fletcher. On the
contrary, he knew that it was not. At his request Fletcher
had written, urging Simonds to pay it. It was unneces-
sary for Fletcher to notify Borden that Simonds alone
was paying the money lest he should, from the appear-
ances, be led to believe the contrary, as in the *Mainzinger
Case*, for the contrary was not only true, but it was appar-
ent. It will be seen, therefore, that this case is not within
the reasoning of the *Mainzinger Case*, unless we can say
that a desire that Simonds should pay, and willingness to
induce him to pay, an honest debt of his own, can be said
to make Fletcher such a participant in the transaction as
to justify the plaintiff in believing the payment to be one
made by him. If we devest the question of the apparent
hardship of allowing the Fletcher estate to avoid its obli-
gation to pay by virtue of the statute, we shall find noth-
ing to justify us in saying that this ought to be treated as
a payment by Fletcher, which it clearly was not, or that
Borden so understood it, which he clearly did not. The
question of payment as a substitute for a written new
promise is separate and distinct from an express promise,
and, if it were not, there is no promise here, oral or writ-
ten, which could have given any different color to this
matter of payment, which is at most a payment by Sim-
onds at the request of his surety, and was so understood.

We may next consider the second question: Did Mr.
Fletcher acknowledge the debt in writing within six years

of his decease, and within the meaning of the statute of limitations? 3 Comp. Laws, § 9740, provides:

"In actions founded upon contract, express or implied, no acknowledgment or promise shall be evidence of a continuing contract, whereby to take a case out of the provisions of this chapter, or to deprive any party of the benefit thereof, unless such acknowledgment or promise be made or contained by or in some writing, signed by the party to be charged thereby."

The only writings signed by Fletcher within six years before his death are the two letters quoted, and we have no hesitation in saying that they do not contain an acknowledgment of a continuing obligation, under the authorities cited in the note to that section.

The third question arises upon the consent to an extension of the note. It was indorsed on the note, and signed by Fletcher, and to get any benefit from it the plaintiff must contend that it was a continuing consent to indulgence. This was dated in February, 1887, and was never renewed. On the contrary, Mr. Fletcher refused to extend the security longer by signing again, when asked to do so by the creditor's agent. He said he had signed it once, and the note was just as good as though he signed it. This occurred about six years after the extension. Counsel for defendant insist that this was a contract for a legal and technical extension, whereby, for a valuable consideration, the creditor should give to the principal debtor, Simonds, a valid and definite enlargement of time, which should give him immunity from suit upon the note during the interval, and that it was a consent to but one such extension, and that such extension was never given. On the other hand, plaintiff's counsel says that this language is susceptible of another meaning, viz., a consent to indulgence, and that, construed in the light of surrounding circumstances, it may be reasonably given that construction.

The testimony shows that the debt was due to a client of Fletcher, and it is reasonable to infer that he was reluc-

tant to bring suit against him, and it is clear that he
yielded to Fletcher's request that he give Simonds time.
It is manifest that he did not wish to release Fletcher, for
he took the writing in 1887. This was a little over three
years from the time the note became due. It was unneces-
sary at this time except upon the theory that Fletcher was
a surety, and that it was the intention to give Simonds a
valid extension of time that might release him. On the
other hand, there is no evidence indicating a design to give
such an extension, or that Fletcher sought for anything
more than forbearance, which he was continually aiding
Simonds to obtain; and, indeed, there is nothing but the
consent itself that indicates that technical extension was
ever asked, and there never was a time when the holder
of the note was under contract obligations not to sue.
When the subject came up between Sessions, acting for
claimant, and Fletcher, neither party seems to have
thought that it referred to technical extension merely.
Sessions appears to have feared that the consent might
soon become inoperative by the lapse of time, and Fletcher
assured him that it was as good as though he signed it
again. The court allowed testimony of Fletcher's refusal
to stand, and struck out the reason for such refusal infer-
able from his language. We are of the opinion that this
testimony was competent, as a circumstance which, with
others, tended to show the light in which the parties at all
times regarded this agreement, which was susceptible of
two interpretations. It was followed by similar conduct,
Fletcher asking and the holder granting forbearance for
several years thereafter; and as late as March 31, 1892,
he appears to have considered himself bound, for he then
wrote to Simonds that they would give another note.
Here was at least a question of fact whether the parties
did not intend and understand the consent to relate to for-
bearance and successive indulgences as to all or a portion
of the note, unless we must say that the written consent
was so unequivocal in its terms as to preclude the idea of
ambiguity.

The language used in this writing is not necessarily ambiguous, but, when taken in connection with the circumstances, is susceptible of a different construction from that which its language imports if taken in its technical sense; yet it is doubtful if the sense contended for by the claimant is not that which would be generally understood by persons outside of the profession of the law. See *Columbus Sewer-Pipe Co.* v. *Ganser*, 58 Mich. 391 (25 N. W. 377, 55 Am. Rep. 697); *Moran* v. *Lezotte*, 54 Mich. 83 (19 N. W. 757); *Home Sav. Bank* v. *Hosie*, 119 Mich. 125 (77 N. W. 625). Parol evidence is admissible to aid in arriving at the intention of parties in the use of equivocal words in a contract. The rule is stated in 2 Am. & Eng. Enc. Law (2d Ed.), p. 291, as follows:

"The true doctrine seems to be that, while direct evidence of intention is not admissible in explanation of ambiguous terms in a writing, yet proof of collateral facts and surrounding circumstances, existing when the instrument was made, may be properly admitted, in order that the court may be placed as nearly as possible in the situation of the testator, or contracting parties, as the case may be, with a view the better to adjudge *in what sense* the language of the instrument was intended to be used, and to apply it to the subject-matter."

Among the cases supporting the rule permitting the interpretation of language, susceptible to two constructions, in the light of surrounding circumstances, is *Facey* v. *Otis*, 11 Mich. 213, where parol proof of such circumstances was resorted to, to determine whether the contract was made by one party for himself or as agent for another. The case of *North American Fire-Ins. Co.* v. *Throop*, 22 Mich. 146 (7 Am. Rep. 638), is another case where parol proof of surrounding circumstances was received to explain the sense in which equivocal language was used. In *Waldron* v. *Waldron*, 45 Mich. 350 (7 N. W. 894), the identity of land devised turned upon such evidence of surrounding circumstances; while in the case of *Moran* v. *Lezotte*, 54 Mich. 83 (19 N. W. 757), the words "running to the rear" were made to read "running

towards the rear," through the force of surrounding circumstances. See, also, *Cook* v. *Brown*, 62 Mich. 479 (29 N. W. 46, 4 Am. St. Rep. 870), and *Home Sav. Bank* v. *Hosie*, 119 Mich. 123 (77 N. W. 625). We have a number of cases which hold that it is competent to show that a name written upon the back of a note was placed there before uttering the note, thereby making one a joint maker who might otherwise be an indorser, and perhaps would be understood to be such from the writing unexplained. *Rothschild* v. *Grix*, 31 Mich. 150 (18 Am. Rep. 171); *Herbage* v. *McEntee*, 40 Mich. 337 (29 Am. Rep. 536); *Greusel* v. *Hubbard*, 51 Mich. 97 (16 N. W. 248, 47 Am. Rep. 549); *Farwell* v. *Ensign*, 66 Mich. 600 (33 N. W. 734); *Sibley* v. *Bank*, 41 Mich. 196 (1 N. W. 930). See, also, *Eckford* v. *Berry*, 87 Tex. 415 (28 S. W. 937). In *Kendrick* v. *Beard*, 81 Mich. 182 (45 N. W. 837), parol evidence was used to determine whether an instrument was intended as a mortgage or conditional sale. For cases permitting evidence of the acts of the parties under the contract as aids to construction, see 2 Am. & Eng. Enc. Law (2d Ed.), p. 293; *Kendrick* v. *Beard*, *supra*. Again, it is stated in 2 Am. & Eng. Enc. Law (2d Ed.), p. 303, that "parol evidence may be admitted where it appears from extrinsic evidence that there are two persons or objects or modes of performance corresponding to the terms of the contract;" and the doctrine is illustrated by cases cited in the note. See, also, Id. 297, 298.

We do not overlook the cases cited by defendant's counsel. The case of *Rochester Sav. Bank* v. *Chick*, 64 N. H. 410 (13 Atl. 872), arose upon a consent quite similar to that in the case before us, except that it was a part of the note itself at the time the note was signed. The case was apparently barren of circumstances indicating any understanding beyond what the words themselves imported. We think the case distinguishable from this case. The case of *Gray's Ex'rs* v. *Brown*, 22 Ala. 262, is also distinguishable. The other cases cited need not be

discussed further than to say that if this consent was an agreement for indulgence, and the same was given in reliance upon it, a consideration for the consent cannot be said to be wanting.

We think the learned circuit judge erred in directing a verdict for the defendant.

The judgment is reversed, and a new trial ordered.

MOORE, GRANT, and MONTGOMERY, JJ., concurred. LONG, J., did not sit.