NICHOLS, SHEPARD & CO. (A CORPORATION) v. GEORGE B. CRANDALL AND THOMAS J. CRANDALL.

*Written contract—Contemporaneous parol agreement not admissible to vary—Breach of warranty—Recoupment.*

The general rule is that parol contemporaneous agreements cannot be admitted to contradict or to vary the terms of a written instrument.

So *held*, where, on the purchase of a steam threshing-machine and engine, a written warranty was given by the vendor, and, in a suit to recover the purchase price, the vendee was allowed to prove a prior *verbal* warranty as to the power of the engine to run a specified separator which was not contained in the written warranty; the admission of which evidence is held erroneous.

Error to Cass.    (Smith, J.)    Argued January 31 and February 1, 1889.    Decided November 8, 1889.

*Assumpsit.*    Plaintiff brings error.    Reversed.    The facts are stated in the opinion.

*Howell & Carr,* for appellant, contended for the doctrine stated in the opinion.

| | |
|---|---|
| 77 | 401 |
| 85 | 518 |
| 77 | 401 |
| 86 | 648 |
| 77 | 401 |
| 99 | 273 |
| 99 | 278 |
| 77 | 401 |
| 101 | 417 |
| 77 | 401 |
| 104 | 285 |
| 77 | 401 |
| 107 | 14 |
| 77 | 401 |
| 112 | 323 |
| 77 | 401 |
| 126 | 213 |
| 77 | 401 |
| s43NW | 875 |
| 129 | 212 |
| 77 | 401 |
| s43NW | 875 |
| 130 | 374 |
| 77 | 401 |
| 144 | 519 |
| 77 | 401 |
| 151 | 666 |
| d151 | 667 |

*Spafford Tryon,* for defendants, contended:

1. Defendants were entitled to show the parol undertaking, or warranty of the capacity of the engine, which induced them to make the purchase; citing *Chapin v. Dobson,* 78 N. Y. 74; *Unger v. Jacobs,* 7 Hun, 221; *Schenectady v. McQueen,* 15 Id. 551, 555; *Juilliard v. Chaffee,* 92 N. Y. 529; *Grierson v. Mason,* 60 Id. 394; *Lamb v. Story,* 45 Mich. 488; *Trevidick v Mumford,* 31 Id. 467; *Kostenbader v. Peters,* 80 Penn. St. 438.

2. The writing, not being signed by the plaintiff, is not the sole or conclusive evidence of the contract, and, so far as the plaintiff's undertaking goes, such writing has no greater force than the oral evidence of witnesses, and will not exclude such testimony; citing *Gage v. Jaqueth,* 1 Lans. 207–213; *Unger v. Jacobs,* 7 Hun, 220. Nor is a party liable upon a written contract who has not signed it, and, until signed, it is not the best or sole evidence of the agreement between the parties; citing *Townsend v. Corning,* 23 Wend. 435; *Osborn v. Rawson,* 47 Mich. 206; *Sovereign v. Ortmann,* 47 Id. 182; *Dillon v. Anderson,* 43 N. Y. 231.

3. Where the original contract was verbal, the law does not exclude parol evidence to show a further or a collateral agreement of one party because part of the contract was reduced to writing, and especially where it was not signed by the other party. In such a case oral testimony when received does not contradict or vary the writing, and violates no rule of evidence; citing 3 Phil. Ev. (2d ed.) 1473; *Potter v. Hopkins,* 25 Wend. 417; *Chapin v. Dobson,* 78 N. Y. 74; *Unger v. Jacobs,* 7 Hun, 220.

LONG, J.   Defendants bought of Nichols, Shepard & Co., a corporation doing business at Battle Creek, a threshing outfit, in the fall of 1884.   On the purchase six notes were given by defendants, amounting to the sum of $1,723.   There remained unpaid on these notes at the time of the trial in the court below the sum of $1,045.80, according to the terms of the notes.

Defendants claimed a breach of warranty on the sale of the engine, and on the trial plaintiff had judgment for $77.   Plaintiff brings error.

Defendants gave a written order for the outfit, which contained the following warranty:

"This machine is ordered, purchased, and sold subject to the following express warranty and agreement, to wit: That with good management the separator is capable of doing a good business in threshing and cleaning grain; * * * also that the said engine is well made, and of good material, and, if properly run and rightly managed, is capable of driving said separator to do good business in threshing; conditioned, that upon starting the machinery the undersigned purchasers shall intelligently follow the printed hints, rules, and directions of the manufacturers; and if by so doing they are unable to make it operate well, written notice, stating wherein it fails to satisfy the warranty, is to be immediately given by the undersigned purchasers to Nichols, Shepard & Co. at Battle Creek, Michigan, and also to the dealer through whom purchased, and reasonable time allowed to get to it, and remedy the defect, if any, unless it is of such a nature that they can advise by letter. If they are not able to make it operate well,—the purchasers rendering necessary and friendly assistance,—and the fault is in the machinery, it is to be taken back, and the payments refunded, or the defective part remedied, and made the same as in their other machines which do perform satisfactorily.

"But if the purchasers fail to make it perform through improper management, or lack of proper appliances, or neglect to observe the printed or written directions, then the said purchasers are to pay all the necessary expenses incurred. Deficiencies in general adaptation for threshing, separating, and cleaning, which alone involves damage or the return of the machinery, are expressly agreed by the undersigned to be reported in writing, as above stated, within five days after starting it, and not after continued use or injury to the machinery; and use without such written notice is conclusive evidence of satisfaction and fulfillment of warranty.

"It is expressly understood and agreed that all warranty on this machinery terminates and expires, and all liability of Nichols, Shepard & Co. for breach of warranty, damage, or otherwise, ceases entirely, at the close of this year. Also, that if any part of said machinery, except the belting, fails during this year in consequence of any defect in material of said part, Nichols, Shepard & Co. are to furnish a duplicate of said part, free of charge, except freight, after the presentation of the defective

piece, clearly showing a flaw in the material, at the factory, or to a dealer through whom said material was bought, at any time within this year; but deficiencies in any pieces do not condemn other parts."

Plaintiff's declaration was on the common counts in *assumpsit*.

The defendants gave notice under their plea of general issue that they would show on the trial that on or about August 15, 1884, they were desirous of going to the territory of Dakota to engage in the business of threshing wheat on an extensive scale, and were desirous of purchasing a threshing-machine of large size, with a steam-engine of sufficient ability and power to drive and operate the same without straining, forcing, or overworking any parts of the same; and the said plaintiff, well knowing that these defendants wanted to purchase a machine and engine with the design and with the purpose of using and operating the same in the territory of Dakota, and well knowing that said machine and engine would be practically worthless in such business unless it possessed the ability and power to work easily and well in such work without forcing or overworking such machine and engine, or any parts thereof, offered *to* sell, and these defendants, on August 15, 1884, offered to purchase of said plaintiff, one of its vibrating separators, and one of its self-guiding traction engines.

That the said plaintiff represented the same, manufactured by the plaintiff, was made of the best material, perfect and complete in all of its parts, and was fit and proper, and was capable of doing the work and business contemplated, without any strain or overwork in any part thereof, as aforesaid; and thereupon the plaintiff, in consideration that these defendants would buy of it, at plaintiff's request, one of said separators, called "Vibrator No. 4," and a self-guiding traction engine, No. 10, man-

ufactured by plaintiff at Battle Creek, its place of business, for a certain price, to wit, $2,000, undertook and promised the defendants that the said machine and engine were made of the best materials, and that both were perfect in structure and manufacture, in all respects, with perfect castings, and furnished perfect and complete in all its parts, from the choicest materials, with the best possible workmanship and finish, and was pre-eminently fitted and proper for extensive business, and that engine No. 10 was of ample power and ability to operate said separator, and would furnish more power than these defendants would need in their business of threshing.

That said engine did not possess sufficient capacity to drive or operate said vibrator No. 4 steam separator, and by reason thereof the said engine could not and did not do the work it was calculated and designed to do, and which it was warranted to perform by plaintiff; and, in consequence of such want of power and ability to do the work required, these defendants were obliged to and did allow the said threshing-machine and men in their employ to lie idle for a long space of time while said engine was being repaired, and also defendants lost the use of said threshing-machine by reason of such want of power to drive said separator to its full capacity, and lost a large number of threshing jobs and the gains and profits resulting therefrom, and the defendants, as well as their men and teams in their employ and use, were idle for a long period of time, etc.   Notice is also given of defects in the machinery of the engine, and damages claimed therefor.

On the trial, Thomas J. Crandall, one of the defendants, was called as a witness, and testified substantially that he met plaintiff's agent, John Root, in the summer of 1884, at Dowagiac, who spoke to him about buying an engine and separator, and induced the defendant to go

to Battle Creek and look at the machines of the plaintiff.

"Arriving at Battle Creek," the witness says, "I told Fred Shepard, one of the firm, that I wanted a large-sized separator, a 36-inch cylinder, and a 13-horse-power engine to drive it. He said he didn't know what in the world I wanted such a power as that for. I told him I was going to take it to Dakota, and I wanted power to drive it for all it was worth,—for all I could put through it. I told them that I was told it required more power there than it did here; that they fed from both sides; and he went on and guaranteed his 10-horse-power to give us all the power we needed, and power to spare in any emergency. He said they did not have a 13-horse-power."

Hereupon the written warranty in the order was produced, and plaintiff's counsel moved to strike out this testimony, as the warranty of the engine was in the writing. Defendants' counsel then stated:

"There seems to be in this paper a printed warranty, but it refers to the machine generally, and not to the capacity and power of the engine to operate the separator. The defendants claim on a special warranty that the engine in question possesses ample power to run the separator, and would run it as well as a 13-horse-power engine, and would guarantee that it had sufficient power to operate successfully in Dakota."

The court overruled plaintiff's motion, and refused to strike out the testimony.

The witness then testified substantially that they relied upon the recommend and warranty of the plaintiff, and that he never saw the written warranty till the contract was made; that he had never run a 10-horse-power engine, and so informed Mr. Shepard; that they shipped the engine and separator to Dakota, and began threshing about August 20, 1884; that the engine lacked power, and they had to fire beyond what they should have done, using from 1,700 to 1,800 pounds of coal, when a half ton

should have been sufficient, and that coal was worth $7.50, and 75 cents to haul; that they threshed about 40 days in the fall of 1884, and averaged about 800 bushels of wheat per day.

Defendants' counsel then asked the witness:

" What sized engine was in use then in Dakota in operating separators? "

Witness answered, under plaintiff's objection, that they used from 12 to 15 horse-power engines there.  Witness then testified that in consequence of heavy firing the flues leaked, and they were compelled to send 42 miles to Fargo to get a man to fix them; that they were delayed three days, and paid the man $10, and after the engine was repaired it stood only three days, and then leaked so badly they were compelled to get it fixed again, and were idle two days; that on each of these occasions four men besides himself were idle; and that they were paying the men from $2 to $4 per day and board; that after being fixed the second time it ran four or five days, and then began leaking so badly they could not use it, and quit in the middle of a job, and he came home.

Witness was then asked by his counsel:

" What amount of work had you engaged? "

Under objection of plaintiff's counsel the witness was permitted to answer this question, and testified:

" I had 1,200 acres engaged.  About three-fourths of it was wheat, and the balance oats.  The wheat would average about 18 bushels per acre, and the oats 50 or 60. The price of threshing was 5 cents for wheat and 3 cents for oats.  The only reason why I did not do these jobs was that the engine gave out.  We could thresh from 50 to 60 acres per day.  Our total money expenses was $19.25 per day.  I began threshing the second season on August 20.  The total amount we threshed in 1884 was 14,650 bushels of wheat and 4,932 bushels of oats, and it took 19 or 20 days.  I was there 23 days.  The second

year I averaged 700 to 800 bushels of wheat, or 1,200 bushels of oats. The separator was capable of threshing 1,200 to 1,400 bushels of wheat, and.1,800 bushels of oats, if it had been run with sufficient power."

The defendants then called Fred East, who testified that he had 30 years' experience in threshing, and that he was in Dakota in the fall of 1884, and was using a Minnesota Chief, 36-inch cylinder, and 12-horse-power engine, for 60 days. He saw defendant there. Witness was then asked by defendants' counsel:

"What did you average per day with that machine?"

Witness was permitted to answer, under objection of plaintiff's counsel, and said 1,300 bushels of wheat and from 2,000 to 2,500 bushels of oats, if all at one place. Witness saw the machine in question that fall, and fed the separator for a while, and stated that he considered the engine rather weak. He was then asked:

"How did it correspond with the engine you were running as to power?"

And answered, under objection, that it was a weaker power; that it did not have power to run the separator to its full capacity; that the engines used in Dakota were from 12 to 15 horse-power. Witness was then asked by counsel for defendants:

"What was the value of the engine in suit for the purpose of running and operating a 36-inch-cylinder separator, like the one in suit, in Dakota in the fall of 1884 ?"

Witness, under objection, answered that ·in his judgment it was not worth anything. On his cross-examina. tion the witness testified that all the engines he saw in Dakota were straw-burners, except defendants; that straw-burners cost less fuel; that the engine seemed to be all right, only it lacked power, and had to labor too hard;

that the difference between the cost of a 10-horse power engine and a 13 is about $300.

Mr. Eaton was called as a witness by the defendants, and testified that he was agent for C. Aultman & Co., manufacturers of engines. He was then asked what sized engine would be required to furnish sufficient power to run and operate successfully a 36-inch-cylinder separator. Under objection the witness answered,—

"A 12-horse-power engine is preferable anywhere for that size separator."

Thomas J. Crandall was then recalled, and testified that the engine would have been worth, freight and all, about $1,600 if it had sufficient power to run the separator as represented, but, as it in fact was, it was not worth over two or three hundred dollars. Upon his cross-examination he was asked by counsel for plaintiff:

"Was it not worth as much as any 10-horse-power engine?"

This was objected to by counsel for defendants as incompetent, and the objection sustained, the court saying:

"I think the question is what it was worth in the market for that purpose. If he buys one to thresh with, he is not obliged to run around to sell it to make wooden bowls with. If he bought it for the purpose of threshing out there with it, and it was recommended to run that particular separator, he is not bound to hunt up any other kind of business for the machine at all, or to sell it."

*Question.* "What was that engine worth in 1884,—not what it was worth to you, or worth for running that separator, but what was it in fact worth in the market?"

Under objection this testimony was ruled out by the court, the court saying:

"I don't think that is a proper question unless you confine it to the purpose of threshing. I don't think he

was bound to try and sell it for anything except threshing."

Mr. Hooden was called as a witness by the plaintiff, and testified that he was employed by plaintiff as collection correspondent; that he kept track of and knew where machines were located. Witness was then asked to state from the knowledge thus acquired how many 10-horse-power engines, 36-inch-cylinder separators, were being used in Dakota. Under objection the answer to this question was ruled out. Witness was then asked to state whether or not plaintiff was from the fall of 1884 to 1885 prepared to furnish a 13-horse-power engine, in all respects like the one in suit, except size. The answer to this question was also ruled out by the court.

Upon the close of the testimony the court stated to counsel, in presence of the jury, its views of the case upon the testimony, as follows:

"The defendants had a warranty outside of the written contract, and that part of the contract which requires them to give notice has reference only to such matters as were warranted in that contract, and does not apply to this special warranty that was made verbally, and was not a part of the contract at all, and therefore they were not bound to give notice at all. As far as the separator is concerned, all the warranty there was on that was that it was a good machine. They didn't warrant it for any particular place, or anything of the kind. I think the special warranty and the warranty in the written contract upon the separator is substantially the same, and that if there was any defects in the separator they would have to give notice of it, and, not giving notice, they could not recover for any defects in the separator. They would be confined to the damages, if any, upon the engine, and, as to that, it was sold for a particular purpose, and warranted to do a particular thing. It was warranted to run, to its full capacity, this 36-inch-cylinder separator.

"Upon the warrant there is no dispute in the testimony. They have not denied at all that they made such a statement to the defendants. If it would not run that

separator to its full capacity they have a right to damages. As to the difference there was in that engine, for the purpose of threshing in Dakota, the difference between what it would have been if it had been perfectly competent to run that separator to its full capacity, and what it was: Taking all the circumstances together in this testimony in relation to the loss and the amount of fields they lost, and the difference there was in threshing, is of no account, so far as it shows the value of the machine. Consequently the only question to be submitted to this jury is, what was the difference, if any, between this machine as it was in 1884 and as it was recommended in this verbal warrant? I think that is all there is of it."

"*By Plaintiff's Counsel.* I understand the ruling will be this: That the jury are to deduct from the amount due the plaintiff on the notes the difference between the actual value of the machine as it was for the purpose for which it is claimed to have been sold, and its value in fact, or its value as it would have been if as represented. "*By the Court.* Yes, sir. If it was worth nothing, as he swears to, then they cannot recover anything, and they will take it just in proportion. If it was worth $500, they would deduct $500. If it was worth all they paid for it, they would recover the full amount."

There might not have been any error in these instructions if the warranty of the engine, as claimed on the trial, had been made a part of the writing. But the court was clearly in error in admitting any testimony of a parol agreement as to the engine.

The general rule is that parol contemporaneous agreements cannot be admitted to contradict or to vary the terms of a written instrument. This rule is based upon the reasonable presumption that where parties have reduced their engagements to writing, and they are plainly and intelligibly stated therein, it is conclusively presumed to embrace all that was intended, and to be the best possible evidence of the intent and meaning of those who are bound by it. *Sutherland v. Crane,* Walk. Ch. 523; *Martin v. Hamlin,* 18 Mich. 354; *Vanderkarr v.*

*Thompson*, 19 Id. 82; *Seaman v. O'Hara*, 29 Id. 66; *Black-wood v. Brown*, 34 Id. 4; *Stackpole v. Arnold*, 11 Mass. 30; *McLellan v. Bank*, 24 Me. 566.

It is laid down in the books as the principal cause of this rule that when parties, after whatever conversation or preparation, at last reduce their agreement to writing, this may be looked upon as the final consummation of their negotiation and the exact expression of their purpose; and all of their earlier agreements, though apparently made while it all lay in conversation, which is not now incorporated into their written contract, may be considered as intentionally rejected. The parties write the contract when they are ready to do so, for the very purpose of excluding everything else and making this permanent and certain. 2 Greenl. Ev. (4th ed.) 60.

This claimed parol agreement as to the warranty of the power of the engine to run a 36-inch-cylinder separator was made prior to the giving the order for the outfit, and which order contained the express warranty. This became the contract of sale and warranty of the outfit, when accepted and acted upon by the plaintiff, and it contains no warranty of power of the engine to drive such a separator.

On the trial it was not claimed that there had occurred any breach of this written warranty, or at least any such breach as would entitle the defendants to damages, without notice to the plaintiff, and giving it an opportunity to repair. In fact the defendants made no complaint, but from time to time wrote the plaintiff that they would pay the notes, asking an extension of time in which to meet them. The court was in error in permitting the defendants to go into this part of the case. It was error to allow such a parol warranty to be shown, or to permit testimony to be given showing damages thereunder. The whole defense to the notes was made to turn upon a claim

of damages under such parol warranty and breach, and defendants were allowed to recoup such damages on the trial to an amount almost equal to the sums remaining unpaid on the notes.

It is not, therefore, necessary to discuss the question raised upon the instruction of the court as to the measure of damages which defendants might recoup. They were not entitled to recoup damages at all under a breach of this claimed parol warranty. If defendants had any defense to the notes growing out of the contract of warranty it could only arise under the written contract, and, upon such a claim, it could only arise after they had given the notice provided in the contract, and after plaintiff had been given an opportunity to repair. Even upon the defendants' own theory the court was in error in permitting the defendants to show their loss upon jobs taken, and it would have had no tendency to show the value of the engine.

Neither could the damages upon such theory be shown without permitting the plaintiff to prove the market value of this engine in Dakota. It would not do to say that it was bought for a specific purpose, and its only value, therefore, would be for the purposes for which it was purchased. This question, however, does not become important, as the court was in error in permitting parol testimony to be given of the warranty.

The judgment of the court below must be reversed, and a new trial ordered, and upon which the parties must be confined to the written warranty and the breaches of that, if any have arisen after notice to repair. Plaintiff will recover costs.

SHERWOOD, C. J., CHAMPLIN and CAMPBELL, JJ., concurred with LONG, J.

MORSE, J., (dissenting). I think that the order given

for the machine in this case did not constitute such a contract as would exclude the evidence of the parol warranty relied upon by defendants. See *Phelps v. Whitaker*, 37 Mich. 72, and cases cited.