McCRATH v. MYERS.

1. MORTGAGES—CONDITIONS—BREACH—DISCHARGE.

Where a purchase-money mortgage provided that it should be discharged if the vendor should fail during his lifetime to convey or cause to be conveyed to the vendee a perfect title, free from all incumbrances, specifying particularly an outstanding interest which he was to obtain, together with an incident claim for rents and profits, the failure to secure a release of such claim for rents and profits, and of a mortgage which the vendor had given when he bought the land, some 38 years before his death, was a breach of the condition of the mortgage from the vendee, and discharged the same.

2. SAME—MATURITY—LIMITATIONS.

It cannot be presumed that the statute of limitations has run against a mortgage, even after the lapse of a long term of years, in the absence of proof as to when the same matured.

Appeal from Kent; Wolcott, J. Submitted January 9, 1901. Decided April 2, 1901.

Bill by John W. McCrath, administrator of the estate of David Haynes, deceased, against William H. Myers and William H. Myers, Jr., to foreclose a mortgage. From a decree dismissing the bill, complainant appeals. Affirmed.

*Maher & Salsbury*, for complainant.

*John E. More*, for defendants

MOORE, J. In 1890 Daniel R. Slocum, administrator of the estate of David Haynes, deceased, filed this bill in chancery to foreclose a mortgage made by defendant William H. Myers in July, 1870. Mr. Slocum afterwards died, and in April, 1898, Mr. McCrath was substituted as complainant herein. In March, 1900, the bill of complaint was dismissed. From the decree the com-

plainant has appealed. A reference to the accompanying
plat will help to explain the situation. In July, 1870,
David Haynes was the owner of an undivided five-sixths
interest of lots 1 and 2 in section 27 in township 9 N., of
range 10 W. His daughter was the owner of the other
undivided one-sixth interest. The conveyance to Mr.
Haynes was of lots 1 and 2 of said section, containing 79
acres, more or less. The record discloses that the govern-
ment survey of these lots was made in 1835 or 1836. Mr.

Myers testified that as early as 1847 inside the meandered
line much of the land had not been covered with water for
many years; that adjoining lot No. 1, within the limits of
the N. W. $\frac{1}{4}$ of section 27, was a large quantity of land
covered with timber, mostly oak, from 18 to 30 inches in
diameter. The record also shows that when Mr. Haynes
obtained title to some of the land from Charles Knapp, in
1839, he gave him a mortgage for part of the purchase
price, which in July, 1870, was undischarged of record.

Mr. Myers desired to buy of Mr. Haynes all of the land on the N. W. ¼ of section 27, which he claims he and Mr. Haynes estimated to be 120 acres, and that Mr. Haynes undertook to make a good title not only to lots 1 and 2, but to all of the land on the N. W. ¼ of section 27, estimated by them to be 120 acres. July 8, 1870, the parties met at the office of Judge Champlin for the purpose of having the necessary papers drawn. They had with them an abstract of title, and the situation of the title was talked over. Judge Champlin testified, against the objection of counsel, in part, as follows, about the transaction:

"The parties stated to me at that time that Mr. Haynes was selling the northwest fractional quarter; that his deed from his wife did not include anything but lots 1 and 2, which described them according to their fractions; together they amounted to 79 acres,—the fractions. But Mr. Haynes stated, and Mr. Myers, also, that he was purchasing all the land there was on that quarter; and the question came up as to the title,—how it stood at that time. Mr. Haynes claimed that he would obtain title from the United States government to all the land on that section, which he thought and which he said would amount to 120 acres, and that he would sell 120 acres, and make a good title to it. They had also there a couple of deeds from some of the heirs of Eliza Haynes. It was talked there were six heirs to that property, and they had a couple of deeds there. He had gone to work, after his wife died, to get the titles from his children; the land formerly having been in David Haynes, and he had deeded it so it came around to his wife. Haynes had deeded it to Stinson, and Stinson deeded it to his wife, and she died; and that left the title in the heirs to lots 1 and 2, and soon after her death he undertook to get the title from the children. December 18th, it seems, he caused some deeds to be drawn up, which were not executed until later. Those deeds from his children all bore the same date,—December 18th. At that time they had in the office a quitclaim deed from Dorothy S. Hill, Adelia H. McCollier, Belmont P. Haynes, and Sophronia, his wife; and, in looking at that deed, I discovered that the premises described were simply lots Nos. 1 and 2, section 27, township No. 9 north, range 10 west, containing 79 acres, more or less. This deed was not executed until later than

the date of it. * * * He had another deed there, from Alfred B. Haynes, Augusta, his wife, and Henrietta Dean. As I understood it, Alfred was his son, and Henrietta Dean was a daughter of Eliza Haynes. This contained the same description of those lots 1 and 2, containing 79 acres, more or less. It was acknowledged the 14th day of January, 1869, and recorded the 8th day of July, 1870,—the day the deed was drawn.

"*Q.* I will ask you whether this deed was presented to you at that time,—deed from Knapp to Haynes?

"*A.* I think Mr. Haynes had this deed at that time. This was a deed of lots 1 and 2, section 27. (The deeds and abstract were offered in evidence.)

"*Mr. Maher:* I make objection to the deeds and the abstract,—that they relate to transactions preceding the making of this mortgage, and are incompetent for that reason.

"*A.* (continuing). Mr. Myers stated to Mr. Haynes that he would not pay him $5,000 for 79 acres of land, as described in those two deeds, and, if he paid him $5,000, he wanted a clear, straight title from the government of the balance to make up the 120, which Mr. Haynes said he would do. Then it was determined that he would make him a conveyance of that 120 acres of the northwest fractional quarter for the consideration of $5,000, and $1,000 should be retained until certain conditions, which they had talked at that time, were performed; that, besides obtaining the title to the quantity of land over the 79 acres up to 120, the further condition was that he should obtain Marion's interest by proper deed of conveyance to Mr. Myers, and acquittance of any claim that she had or might have to the rents and profits or her share of the use of the land as one of the heirs, and a discharge of the Knapp mortgage of record. He requested me to draw a mortgage embodying those conditions, which I did. For that $1,000 he would not give any personal obligation; he was to give simply a mortgage upon the land, without any note or bond. * * * Haynes said he gave the mortgage as shown on the abstract there, and never had paid it,—never had paid anything on it. There was nothing said about when the mortgage matured, that I have any recollection of, but it was a time mortgage. It was given for the purchase money of the property; but he would pay it and cause it to be discharged of record, so that the title would be unincumbered upon the record and clear."

Judge Champlin also testified that part of the $4,000 was made up of one note of $300 and one of $500, neither of which was negotiable, and that those notes were left with Judge Champlin, not to be delivered to Mr. Haynes until he had procured a deed from his daughter of the one-sixth interest. As a result of the talk between the parties, Judge Champlin drew a warranty deed running from Mr. Haynes to Mr. Myers, reciting the consideration to be $5,000, conveying lots 1 and 2, section 27, township 9 N., of range 10 W., being the N. W. fractional quarter of said section, containing 120 acres of land. At the same time the mortgage which it is sought in this proceeding to foreclose was given. Those parts of the mortgage material to this discussion read as follows:

" *Whereas*, as David Haynes, of Courtland, in the county of Kent and State of Michigan, has this day conveyed to William H. Myers, of the same place, by warranty deed, all of the following described lots or parcels of land, situated, lying, and being in the town, county, and State aforesaid, known and described as follows, viz.: Lots numbered one (1) and two (2) in section twenty-seven (27) in township number nine (9) north, of range number ten (10) west, being the northwest fractional quarter of said section, for the consideration of five thousand dollars;

"*And whereas*, the said David Haynes has agreed to obtain and convey or cause to be obtained and conveyed to the said William H. Myers, his heirs or assigns, a good, sure, perfect, and indefeasible title in fee simple of said real estate, free and clear of all incumbrances;

"*And whereas*, a daughter of said David Haynes, named Marion (formerly Marion Stinson), is an heir at law of Eliza Haynes, deceased, and as such is the owner of and entitled to one undivided one-sixth of the real estate above described, which undivided one-sixth aforesaid of said real estate the said David Haynes has agreed to cause to be conveyed to the said William H. Myers, his heirs or assigns, in consideration of the purchase price aforesaid, without costs or expenses to him, said Myers, his heirs or assigns, and also to save harmless and indemnify said Myers, his heirs and assigns, against any and all claims of said Marion now or hereafter to be made for any share

of the profits made on said premises, or for any claim
for the use thereof, and for all costs and expenses on
account thereof which he may be put to or suffer;

"*And whereas,* it has been and is hereby mutually
agreed that the sum of one thousand dollars, parcel of the
purchase price aforesaid, shall be retained and kept back
by said Myers until the said Haynes makes or causes to be
made to the said Myers, his heirs or assigns, a perfect
title in fee simple of said lands, free and clear from all
incumbrance, and especially the undivided one-sixth owned
by said Marion as heir at law aforesaid, and until full
acquittance shall be obtained from her, her executors,
administrators, heirs, or assigns, for any and all claims of
any share of the profits made on said premises, and for all
claims for the use thereof, up to the time of such convey-
ance of her interest to said Myers, his heirs or assigns,
until the conveyance to him, his heirs and assigns, of the
said Marion's interest in said land, and against any claim
she may make as aforesaid, and all costs and expenses on
account thereof;

"And it is further mutually agreed that, in case the
said David Haynes shall die before perfecting said title as
aforesaid, then on the happening of that event the said
William H. Myers, his heirs, representatives, or assigns,
shall be fully discharged from all liabilities to pay said
sum of one thousand dollars, or any part thereof, and this
mortgage shall cease and be null and void;

"*And whereas,* it has been agreed that, subject to the
foregoing recited agreement, the payment of said sum
and interest shall be secured on said premises, to become
due and payable when the foregoing agreements set forth
in the foregoing recitals are fully performed and complied
with by said David Haynes, but in no event sooner than
ten years from the date hereof, should such title be per-
fected and acquittance made during the lifetime of said
David Haynes, and sooner than that time;

"*Now, therefore,* this indenture witnesseth that William
H. Myers, party of the first part, for and in consideration
of the sum of one thousand dollars to him in hand paid by
David Haynes, party of the second part, the receipt
whereof is hereby confessed and acknowledged, has
granted, bargained, and sold, and by these presents does
grant, bargain, and sell, unto the said party of the second
part, forever, all those certain pieces or parcels of land
situated, lying, and being in the town of Courtland,

county of Kent, and State of Michigan, known and described as follows: Lots one (1) and two (2) in section twenty-seven (27) in township nine (9) north, of range ten (10) west, being the northwest fractional quarter of said section, containing one hundred and twenty acres of land,—together with the hereditaments and appurtenances thereunto belonging or in any wise appertaining; to have and to hold the above-bargained premises unto the said party of the second part, his heirs and assigns, forever: *Provided*, always, and these presents are upon these express conditions, that the said party of the first part shall pay or cause to be paid to said party of the second part one thousand dollars, and interest at ten per cent., payable annually at the house of said party of the first part, in Courtland, Kent county, Michigan, when the said party of the second part perfects the title in said William H. Myers to the land hereinbefore described, and fully fulfills, performs, and complies with the agreements mentioned in the recitals in the preamble to this indenture, which said agreements as recited in said preamble are hereby made a part of the conditions of these presents, the same as if said agreements were fully incorporated herein: *Provided*, nevertheless, that, in case of the death of said party of the second part before the said agreements are fulfilled and performed by said party of the second part, the said payment shall be thereby discharged, and said party of the first part shall be thereby fully acquitted and discharged from the payment of said sum or any part thereof, and these presents shall thenceforth cease and become null and void: *And provided*, further, that in no event shall the said principal sum become due and payable in a less period than ten years from the date hereof."

Upon this mortgage were several indorsements, the first and the last of which read, respectively, as follows:

"COURTLAND, July 8th, 1871.
"Paid on the within mortgage one hundred dollars. This is paid under protest.
"DAVID HAYNES."

"July 5th, 1877.
"Received on the within mortgage one hundred dollars ($100.00) due at this date, and thirty dollars to apply on interest due in 1878.
"DAVID HAYNES."

After these papers were drawn, Mr. Haynes procured a quitclaim deed from Marion conveying all of lots 1 and 2 on section 27, town 9 N., of range 10 W., lying and being in the county of Kent and State of Michigan, containing 79 acres, more or less. The deed was acknowledged in the State of Kansas October 22, 1870. The record does not disclose any other deed or acquittance from her. This deed was delivered to Judge Champlin, and he delivered to Mr. Haynes the $300 and the $500 notes which had been left with him to be delivered when this deed was obtained.

In January, 1876, the land department of the Grand Rapids & Indiana Railroad Company caused a survey to be made of section 27 and the E. ½ of section 28, claiming that all of the lands within the meandered line were within the limits of their land grant, and, not having been conveyed by the United States, belonged to them. It does not appear that any further action was taken in the matter by the railroad company. Mr. Haynes never obtained any other title to the land in question than what has been stated. After he sold the land to Mr. Myers, he went to Indiana. The interest for 1874 was left by Mr. Myers with Saunders & Morris, at Rockford. At the time Mr. Haynes called for it, he told Mr. Morris he could not get up the Knapp mortgage, and never expected to do so; that all he expected to get out of the Myers mortgage was the interest, of $100 a year, as long as he lived. Knowledge of the survey of the railroad company came to Mr. Myers, and he consulted Judge Champlin about it. The latter wrote to the commissioner of the general land office, and was informed that legislation by Congress would be necessary before anything could be done about the land within the meandered lines. When Mr. Haynes came up from Indiana in July, 1877, to get his interest, he called on Mr. Myers for it at his house in Courtland. Mr. Myers refused to pay it without coming to Grand Rapids and taking counsel with Judge Champlin, to ascertain whether, in view of this claim of the railroad company, he was still

bound to pay the interest. Mr. Myers and Mr. Haynes came to Grand Rapids and saw Judge Champlin. Mr. Myers asked him if, in view of this claim of the railroad company, he was bound to pay the interest, and he was advised that he would have to pay the interest under the terms of the mortgage. Mr. Haynes then stated to Mr. Myers and Judge Champlin that he could not perfect the title in accordance with the agreement, that it was impossible for him to get up the Knapp mortgage, that he had no means to do it, and that Mr. Myers would have to protect himself against that mortgage, and against the claim of the railroad company or the United States as to all the land in excess of the government survey of lots 1 and 2. Mr. Myers paid Mr. Haynes the interest due on July 8, 1877, and also advanced to him $30 to apply on the interest which would fall due in 1878, on the statement of Mr. Haynes that it was necessary to save his home from being sold for taxes. Mr. Haynes died about the 1st of August, 1877, having done nothing further towards perfecting the title than has been stated.

The record in which the Knapp mortgage was recorded was destroyed by fire years ago. The mortgage itself was not offered in evidence. An abstract showing the date and amount of the mortgage, but not when it was payable, was received in evidence. All the testimony in relation to said mortgage and its maturity has been stated, except that Mr. Myers said the last time he saw Mr. Knapp was in 1851, and Judge Champlin testified on cross-examination:

"*Q.* You never have heard of anybody demanding the payment of the Knapp mortgage, have you?

"*A.* Yes; I heard there was.

"*Q.* When?

"*A.* Well, it was along about 1872; along there somewhere; 1872 or '73.

"*Q.* There never have been any efforts made to enforce its payment?

"*A.* Nothing that I know of."

After the death of Mr. Haynes, one of the heirs called on Mr. Myers in the early part of 1879 and demanded payment. She was informed by Mr. Myers that, as Mr. Haynes had failed to comply with the conditions of the mortgage in his lifetime, there was no liability under it. Nothing further was done about the mortgage until the foreclosure bill was filed, in 1890.

The administrator stands in the same relation to Mr. Myers that Mr. Haynes would occupy if he were living. If Mr. Haynes could foreclose the mortgage, the administrator could. If Mr. Haynes could not, the administrator could not.

The solicitors for the complainant insist that it is sought to go outside of the deed and mortgage, and to establish by parol that Mr. Haynes was agreeing to sell 120 acres, and that, if he failed to obtain a conveyance of more than one-third of that amount from the United States government in his lifetime, the mortgage was to be forfeited, and say parol evidence is not competent; citing *Martin* v. *Hamlin*, 18 Mich. 354 (100 Am. Dec. 181); *Ortmann* v. *Bank*, 39 Mich. 518, 519; *Kulenkamp* v. *Groff*, 71 Mich. 675, 679 (40 N. W. 57, 1 L. R. A. 594, 15 Am. St. Rep. 283); *Nichols, Shepard & Co.* v. *Crandall*, 77 Mich. 401, 411 (43 N. W. 875, 6 L. R. A. 412); *Phelps* v. *Abbott*, 114 Mich. 88, 92 (72 N. W. 3). Without passing upon the question as to how much may be shown by parol in relation to the consideration for a deed or mortgage, we think it clear, from the papers themselves, that Mr. Haynes undertook to convey to Mr. Myers the title to the N. W. ¼ of this section. The testimony is all agreed that there was embraced within this N. W. ¼ at least 120 acres of land, while the actual survey shows it to embrace upwards of 140 acres. It was the duty of Mr. Haynes in his lifetime, and before the mortgage could be foreclosed, as stated in the mortgage, to convey or cause to be obtained and conveyed to the said William H. Myers, his heirs or assigns, a good, sure, perfect, and indefeasible title in fee simple of said real estate, free and clear of all incumbrances.

Has he done so? The daughter, Marion, quitclaimed her one-sixth interest in lots 1 and 2, containing 79 acres, but she did not release any interest she had for rents and profits; nor did she release any interest she might have to any portion of the N. W. fractional quarter of section 27 outside of lots 1 and 2, if she had any such interest. It is conceded that the Knapp mortgage was not discharged of record, but counsel insist that the provisions of the mortgage related simply to the perfecting of the title to the one-sixth interest held by Marion, and that as the Knapp mortgage is not named as a cause of forfeiture, while the procuring of the sixth interest of Marion is, "the maxims, '*Expressio unius est exclusio alterius*,' and '*Noscitur a sociis*,' are both applicable to the transaction; that general terms employed in a written instrument are limited by special recitals; and that, when the deed from Marion was procured, Mr. Haynes had performed what he agreed to do." As before stated, when these papers were drawn, an abstract of title was before the parties, which showed the Knapp mortgage as an outstanding mortgage. The daughter was not the possessor of any incumbrance against the property. She owned an undivided one-sixth of it. Provision was made not only for obtaining her interest, but also for clearing the land of all incumbrances. Can there be any doubt that the parties then had in mind the Knapp mortgage? We think not. And this view is strengthened by the fact that Mr. Haynes, upon repeated occasions after these papers were drawn, acknowledged his duty to pay this mortgage and have it discharged.

Counsel say that so much time has elapsed that the mortgage must be presumed to be paid. They urge:

"There being no evidence that any specified time was fixed for the payment of the Knapp mortgage, there is no legal presumption that it was payable at any particular time, but it is to be presumed that it was payable presently or on demand, or, at the furthest, within a reasonable time, like any other contract where credit is extended

without specifying the time for payment. *Kimball* v. *Kimball,* 16 Mich. 212, 219. The statute of limitations begins to run against such a demand from its date. *Palmer* v. *Palmer,* 36 Mich. 487 (24 Am. Rep. 605); *Home Sav. Bank* v. *Hosie,* 119 Mich. 131 (77 N. W. 625); *Citizens' Sav. Bank* v. *Vaughan,* 115 Mich. 159 (73 N. W. 143)."

It is undoubtedly true that when a debt is payable on demand it is payable presently, and the statute will at once begin to run. But it does not appear that this mortgage was payable on demand. On the contrary, Mr. Haynes stated to Judge Champlin that it was a time mortgage, while he recognized but a few weeks before his death his duty to pay it. It is a matter of common knowledge that mortgages are sometimes given for long periods of time. We cannot say, in the absence of any proof as to when the mortgage matured, that the statute of limitations has run against it.

It is also claimed that, by virtue of the conveyance to Mr. Haynes, he obtained title to the N. W. ¼ of the section. It is said meander lines are not intended to be boundary lines; they are to designate the quantity of land to be paid for when purchased from the government, and not to define the limit of ownership; the patent from the United States conveyed the entire subdivision, without reference to the meander lines of the survey,— citing Rev. Stat. U. S. § 2396, subd. 3; *Palmer* v. *Dodd,* 64 Mich. 474 (31 N. W. 209); *Hardin* v. *Jordan,* 140 U. S. 371 (11 Sup. Ct. 808); *Railroad Co.* v. *Schurmeir,* 7 Wall. 272. On the part of the defendants it is insisted that the record shows that at least 31 acres of land south and east of lot 1 were covered with heavy oak timber, which shows that at the time it was surveyed it was not part of the lake, and therefore the meander line was an untrue line, and left at least 31 acres of good land unsurveyed, the title to which was left in the United States; citing *Horne* v. *Smith,* 159 U. S. 40 (15 Sup. Ct. 988).

We do not deem it necessary to pass upon this question.

As we have before stated, it was the duty of Mr. Haynes in his lifetime to convey or cause to be conveyed to Mr. Myers title to the entire N. W. ¼. To do this it was necessary to clear the land of the incumbrance of the Knapp mortgage, and to procure from his daughter, Marion, an acquittance of any claim she might have for use and profits of the land in question. *Curtis* v. *Goodenow*, 24 Mich. 18. This was not done. But it is said that the case of *Legare* v. *Semple*, 32 Mich. 438, is a complete answer to the contention of defendants. We do not so read the case. The court did hold in that case that, as Mrs. Peacock had no right of dower in the land, there was nothing for her to release, and therefore a failure to obtain a release from her could not be set up as a defense to one of the notes, and that complainant was in a position to foreclose as to that note. It also held that as to the second note the complainant seemed to be in a condition to comply with the restrictive clause of the second note, but it also held that, if complainant did not comply with the restrictive clause, the bill should be dismissed. It not only does not appear that Mr. Haynes was in a position in his lifetime to comply with the conditions of the mortgage, but, if we are to believe the testimony, but a short time before his death he admitted that he had not complied with its conditions, and did not expect to do so.

The decree is affirmed.

LONG and GRANT, JJ., concurred. MONTGOMERY, C. J., and HOOKER, J., did not sit.