WILLIAMS *v.* WALSH MANUFACTURING CO.

Contracts—Words and Phrases—"Proceeds."

    Under a license contract between an inventor and manufacturer providing that the manufacturer should have a half interest in the patent which had been applied for, should have the right to manufacture said invention or license its manufacture and use upon a royalty, paying the inventor one-half of the net proceeds of the royalty, license fee or other consideration of each license, the manufacturer to advertise the product and introduce it and make the business, so far as possible, successful, the term "net proceeds" included the profits after deducting losses on sales, expenses, and costs of the business: Per Moore, C. J., and Steere, McAlvay, and Brooke, JJ.

    Blair, Stone, Ostrander, and Bird, JJ., holding that complainant was entitled to half the proceeds of licenses, without deducting losses, and was not interested in profits on the manufactured product.

Appeal from Branch; Yaple, J. Submitted June 9, 1911. (Docket No. 24.) Decided May 3, 1912.

Bill by Charles F. Williams against the Walsh Manufacturing Company, a foreign corporation, for an accounting. From a decree for complainant, defendant appeals. Reversed.

*Merriam, Yerkes & Simons* (*George N. Monro, Jr.*, of counsel), for appellant.

*F. A. Lyon*, for complainant.

McALVAY, J. The bill of complaint was filed in this cause, asking for a disclosure, an accounting, the construction of a certain contract, an injunction, and general relief. The record shows that the cause, either originally or by removal, was pending in the Circuit Court of the United States for the Eastern District of Michigan, Southern Division. By a stipulation, all of the files, exhibits, and testimony in the case in that court have been received and treated as the original files, etc., in this case.

It appears from the briefs of both parties that they consider the matter of dispute in the case to be the construction of the following contract between these parties:

"This agreement made this twenty-second day of September, 1904, by and between Charles F. Williams, of Marion, Michigan, party of the first part, and the Walsh Manufacturing Company, a Pennsylvania corporation, having its general office at Pittsburg, Pennsylvania, party of the second part: Whereas, the party of the first part has invented a certain new and useful improvement in kilns for drying lumber, for which an application for letters patent of the United States was filed by him on July 13, 1904, serial No. 216,450; and whereas, the party of the second part is desirous of acquiring a one-half undivided interest in the said invention and the letters patent to be obtained therefor and both the parties hereto are also desirous of putting the said invention on the market upon the terms hereinafter set forth: Now, therefore, these presents witness, that for and in consideration of

one dollar to him in hand paid by the party of the second part, the receipt of which is hereby acknowledged, and other good and valuable considerations, the said Charles F. Williams, party of the first part, has sold, assigned and transferred, and by these presents does sell, assign and transfer, unto the said the Walsh Manufacturing Company, party of the second part, its successors and assigns, the one-half undivided interest in and to the said invention set forth in the specifications forming part of the above recited application, serial No. 216,450, or intended so to be; and he does hereby authorize and request the commissioner of patents to issue the said letters patent to be granted as aforesaid to the said the Walsh Manufacturing Company and himself, as the owners thereof; and further, for the consideration aforesaid, the said party of the first part does hereby grant unto the party of the second part, its successors and assigns, the right, free of royalty or other charge, to manufacture, sell and use kilns embodying the said invention, at any and all plants now and hereafter owned or controlled by it, and upon the conditions hereinafter stated, the exclusive right to license others to manufacture for their own use and to use such kilns, but not to sell; the party of the first part, however, reserving the right to build for his own use, and to use free of charge, one kiln only embodying the said invention.

" It is hereby covenanted and agreed between the parties hereto, for themselves, their successors, legal representatives and assigns, that the licensing of others to use the said invention shall be upon the following terms and conditions, to wit:

"(1) The party of the second party may license others to build for their own use, and to use, kilns embodying the said invention, or it may itself build and sell to others to be used, such kilns, in either case charging such royalty, license fee, or other consideration as to it may seem best, but shall not grant any license without royalty or other consideration, and shall, immediately upon its receipt thereof, pay to the party of the first part one-half the net proceeds, whether by way of royalty, license fee, or other considerations, of each such license granted by it to others.

"(2) The party of the second part shall use its best endeavors to introduce the said kilns into the market and to sell licenses to others to use the same, and to make the business a successful and profitable one; it will advertise

the same in some first-class cooperage journal, and in some lumber journal or paper, and in case it shall seem best to employ a special representative or agent to exploit the said invention, it will confer with the said party of the first part as to the employment of such agent, and in what manner the business shall be handled.

"(3) The party of the second part shall also keep full and accurate accounts of the licenses granted to others as hereinbefore provided, and the proceeds thereof, and shall exhibit the same to the party of the first part, or his duly authorized agent, at all and reasonable proper times.

" (4) The party of the first part will not grant any licenses under the said letters patent to any party whatsoever, and for all kilns which said party of the first part may himself desire to use, in addition to the single kiln, the right to use which without charge, has been hereinbefore reserved to him—he will pay to the party of the second part a royalty to be agreed upon.

" (5) Neither of the parties hereto nor their successors, legal representatives, or assigns, shall, without the consent of the other, sell or assign to any others their interest in the said letters patent or any part thereof.

" In testimony whereof, witness the hands and seals of the parties hereto affixed the day and year above written.
" CHARLES F. WILLIAMS.
" THE WALSH MANUFACTURING COMPANY.
　　　　　" J. V. WALSH, Pres. and Treas."
" Witnessed.　Jurat."

It appears that these parties had business dealings before January 29, 1904, the result of which was that complainant was indebted to defendant to the amount of $400. Complainant on that date made an offer, by letter, to sell defendant a small heading mill he was running at Marion, Mich., by which means this indebtedness could be paid, in which letter the kiln which complainant desired to patent was mentioned. Mr. Walsh, representing defendant, in April following, came to Marion and examined the mill, and also the dry kiln, which was a part of it. The result of the visit was that defendant purchased the plant, which was held in the name of complainant's wife, for the sum of $800, on the next day, April 16, 1904, and on the same day defendant company, by an agreement in writ-

ing, employed complainant, at a salary of $1,200, as manager of this mill plant at Marion for a period of one year, beginning June 1, 1904, with an option to defendant to renew for another year on the same terms, if his services were entirely satisfactory.

At this time, the letters patent on the kiln had been applied for, but not issued. Negotiations were then begun between the parties relative to defendant acquiring a one-half interest in this patent and with the complainant to put the invention on the market. These negotiations, after correspondence and suggestions, finally culminated in the written contract above set forth, under which the parties entered into the business of selling licenses and manufacturing and selling dry kilns according to its terms. Complainant, under his contract, continued to run the Marion plant as manager for about one year; then, the business of manufacturing and selling kilns having developed, he was taken from such management and employed exclusively in connection with that branch of the business, and so continued from about April 10, 1905, until March 1, 1907, when business relations between the parties ended.

The following paragraph of this contract is the part over which this dispute arises:

"(1) The party of the second part may license others to build for their own use, and to use, kilns embodying the said invention, or it may itself build and sell to others to be used, such kilns, in either case charging such royalty, license fee, or other consideration as to it may seem best, but shall not grant any license without royalty or other consideration, and shall, immediately upon its receipt thereof, pay to the party of the first part one-half of the net proceeds, whether by way of royalty, license fee, or other considerations, of each such license granted by it to others."

Complainant's contention is, as stated in his brief, that this contract provides that the defendant, in case kilns were manufactured and sold upon the market, was obligated to pay the entire expense of all kinds incurred in

such manufacture and sale, "as against the invention" put in by complainant, "and [such expenses] were not to be charged up against the kiln business, or against the complainant." And, further, that each kiln was to be the unit of settlement, and defendant required to pay the complainant one-half of the entire net proceeds received by it on each transaction, whether arising from a license to use a kiln or the sale of a manufactured kiln. To establish such construction, complainant introduced a great deal of testimony relative to conversations, agreements, and understandings between these parties before they finally entered into the written contract; such testimony being claimed to be admissible to show what was the consideration to complainant, and to ascertain the true intention of the parties to this contract, upon the theory that such intention is not clearly expressed.

Defendant contends that by this contract the parties entered into a joint venture, for the purpose of selling licenses to others to use this patented kiln, and to manufacture and sell the kiln upon the market, and carrying on and developing the business; that it furnished all of the money to pay for labor, materials, and expenses of all kinds to carry on this joint adventure in selling licenses and manufacturing and marketing the kilns, all of which, together with the losses, if any, were to be deducted from the receipts of the business before any division of net profits was to be made; that the term "net proceeds" in this contract is equivalent to net profits.

Evidence outside this written instrument to explain its meaning, and to arrive at the intention of the parties, is only admissible when the same cannot be gleaned from the instrument itself.

Turning to the instrument, we find that complainant had invented this kiln and made application for a patent thereon; that defendant desired to acquire a one-half interest in the invention and the letters patent; that both were desirous of putting the invention upon the market

upon certain terms, which they set forth in the contract. By these recitals, we are given the situation of the parties, the thing with which they were dealing, and the object of the venture.  In furtherance of their undertaking, complainant sold to defendant an undivided one-half interest in his invention, and authorized the issuance of the letters patent thereon to both of them as joint owners.  Defendant was given "the exclusive right to license others to manufacture for their own use, and to use, such kilns, but not to sell," upon the following terms:

"(1) The party of the second part may license others to build for their own use, and to use, kilns, embodying the said invention, *or it may itself build and sell to others to be used, such kilns,* in either case charging such royalty, license fee, or other consideration as to it may seem best, but shall not grant *any license* without royalty or other consideration, and shall, immediately upon its receipt thereof, pay to the party of the first part one-half of the net proceeds, whether by way of royalty, license fee, or other considerations, of each such *license* granted by it to others."

Defendant agreed to use its best endeavors to introduce the said kilns into the market, and to sell licenses to others to use the same, and to make the business a successful and profitable one, to advertise the same, and, if it seemed best, "to employ a special representative or agent to exploit said invention."  It agreed to confer with complainant "as to the employment of such agent, and in what manner the business shall be handled."  Defendant also agreed to keep accounts of all licenses granted to others, and the proceeds thereof, open to the inspection of complainant.  Other terms of the contract are not material to the issue.

We are of opinion that upon its face a fair interpretation of this contract is that the parties entered into a joint adventure to sell licenses, and to manufacture and sell dry kilns, and to equally share in the result of such adventure. They started out with the intention of putting the invention upon the market, and, to bring about such result,

undertook "to make the business a successful and profitable one." Equally interested in the business, they were to confer together as to the employment of a representative and in the manner of conducting it.

Complainant and his solicitor, when this suit was instituted, in a petition, in this case, drawn by his solicitor and verified by complainant, for the purpose of obtaining a receiver, stated the relations of these parties to be as follows:

"And your petitioner further represents that the relations created by and existing between your petitioner and the said Walsh Mfg. Co., by force of and under said contract, was to make your petitioner and the said Walsh Mfg. Co. jointly interested in the business of manufacturing and selling said kilns, and licensing others to use kilns, * * * which said relationship existed between your orator and the Walsh Mfg. Co. * * * (made) the business to be carried on under and by virtue of said contract a joint adventure in the nature of and akin to a partnership, with few exceptions."

We do not find that this contract is in its terms ambiguous and uncertain, or that the intention of the parties cannot be found within the instrument, taken as a whole. It follows that the large amount of testimony introduced by complainant, of facts and statements which occurred prior to the execution of the written instrument, was incompetent.

As bearing upon the construction of the contract, not bearing in mind his former views, complainant now urges that he was not to receive anything as net profits of the business, but was to receive one-half of the net proceeds of each kiln.

An examination of the bill of complaint discloses that complainant charges therein that the defendant agreed to use its best endeavor to make a profitable and paying business for both parties, and to that end this contract was entered into; that in the prosecution of said business there were manufactured and sold 29 kilns (naming the parties who purchased them), at a price of $1,000 to $1,600

each; that the net profit on each kiln was from $500 to
$700, making a total net profit of $14,000 to $18,000 on
kilns sold, over and above the amount received for licenses,
"one-half of which said net profits, under and by virtue
of the terms of said contract, belonged to your orator."
Further, that other kilns were sold and other licenses were
granted to persons unknown; "one-half of which said
license fees and one-half of the net profits upon said kilns
belong to your orator." The bill of complaint charges
that he made a demand for an account of these sales and
licenses granted, "showing the net profits received," in
order that he "might determine the exact condition of the
said business and the exact amount of the net profits be-
longing to your orator from said business."

Complainant, in his letters to defendant, also construed
the contract as giving him a share in the net profits.
This construction, upon which complainant has planted
his suit, is, in our opinion, correct. "Net proceeds" used
in this contract is equivalent to "net profits." The dis-
tinction between these terms now claimed by the com-
plainant, in support of the contention that any losses in-
curred in the conduct of this business cannot, under the
contract, be charged against him, is contrary to a fair
construction of the instrument and the practical construc-
tion given by the parties. This was a joint adventure,
partaking of the nature of a partnership, and governed
by the same rules, as far as determining the net profits is
concerned.

Complainant, as soon as the first kiln manufactured
was ready for installation, was put in charge of such
work, and so continued as long as the business continued,
under salary paid him by defendant, together with all of
his expenses. He went from State to State, wherever
needed, and was the man upon whom defendant relied.
From this record, containing a voluminous correspond-
ence between the parties, and their testimony, we find that
complainant was the practical kiln man, who understood
the business, and who took charge and superintended the

installation and management of installing these kilns; and defendant was guided by his advice and instructions.

The contract is silent as to losses, but provides for a participation in net profits, which of itself contemplates the deduction of all expenses of every kind in carrying on the business, and of all losses sustained.

The proposition that under this contract complainant is entitled to a share in "net proceeds" (net profits), without taking into consideration losses determining such net profits, is not supported by a fair interpretation of the contract. In fact, we have not been able to understand what complainant, in his brief and oral argument, contends will constitute "net proceeds." It would seem that a fair deduction from the argument is that "net proceeds" means the entire sales price of each kiln, without any deduction for material, labor, or the usual and ordinary expenses of conducting a manufacturing business. As we understand, this construction is based upon certain claimed conversations between the parties as to what the terms of the contract would be, before it was reduced to writing and signed. The contract these parties made, and which we are called upon to construe, will not bear any such construction.

The paragraph of this contract over which this dispute arose has been quoted at length twice, and need not be repeated. By it the parties intended to, and did, give to defendant the exclusive right, in putting this invention upon the market for the benefit of both, to do the same in two ways: (1) To "license others to build for their own use, and to use, kilns embodying the said invention;" and (2) "to build and sell to others such kilns to be used by them." The first required merely signing and delivering a proper written permit for the purposes mentioned and receiving payment therefor, either in cash, time paper, or other consideration, to which there could be no large expense attendant. The second required an investment of money for material, the expense necessary to provide specifications for the kiln, and for labor in constructing,

superintending, installation, and installing the same. The second would be actually entering into a manufacturing business to put upon the market a manufactured article for sale, subject to all the ordinary risks of such a business. This was not the granting of a license, and is nowhere so considered in the contract. These things were necessarily within the knowledge of the parties at the time of making the contract, and were taken into consideration by them.

The provision made, relative to the payment of complainant's share by defendant, reads:

"And shall, immediately upon its receipt thereof, pay to the party of the first part [complainant] one-half the net proceeds * * * of *each such license* granted by it to others."

It is insisted that this clause made each kiln sold and paid for a unit of settlement; and complainant was entitled to his half of the net proceeds as soon as the same was paid. This view was taken by the trial court. In order to give such construction, something must be added to this clause. It does not speak of a kiln sold and paid for. It does designate a license.

The presumption is that every contract was intended to permit a performance in accordance with its terms; and such construction is, if possible, always given. The construction claimed would have been impossible of performance. In a going manufacturing business, where the article is put upon the market, only the most clearly expressed terms would warrant a court in holding that the parties intended, when each unit was sold and paid for, to determine the net profits of such sale. In such a business as this, it would be an impossibility, considering all the elements which enter into consideration in arriving at the result; and by no means whatever could losses to the business be even estimated. Such results can be determined only at stated periods. We must hold that kilns manufactured and sold in the course of this business were not within the contemplation of the parties in the require-

ments of payment provided by this clause; that licenses only were included. The contract makes no provision relative to settlements and payment to complainant of his share of net profits arising from such sales; and such omission would in no way interfere with the due performance of the contract.

Other questions do not require discussion.

The relations between these parties personally and their conduct and disputes are not material to this issue. We have for consideration only the construction of the written contract. Under the contract, complainant is entitled to an accounting with defendant to determine the amount of net profits, if any, arising from this joint adventure between the parties, arising from license fees and sales of manufactured kilns, after deducting all losses on sales, and all expenses and costs incurred in any way in connection with carrying on the business, including all attorney's fees and costs in making collections, and in prosecuting or defending suits arising out of sales of kilns or otherwise.

The decree of the circuit court is reversed, and a decree will be entered in this court in accordance with this opinion. The cause will be remanded for the purpose of such accounting. Defendant will recover costs of both courts, to be taxed.

MOORE, C. J., and STEERE and BROOKE, JJ., concurred with MCALVAY, J.

OSTRANDER, J. Standing alone, the clause in the contract, the meaning of which is in dispute, is not ambiguous. Fairly interpreted, it means that whether another is permitted to embody the invention in a kiln built by himself, or whether the defendant builds and sells a kiln embodying the invention, in either case a royalty or a license fee, or some other consideration *for the invention*, shall be collected. Defendant has the right to fix the fee to be collected, but must in each case fix a license fee, or royalty, or make a charge, for the in-

vention as such. I do not interpret the contract as meaning that the parties were to jointly engage in the business of building kilns. Defendant could build and sell kilns embodying the invention, if it chose to do so. Complainant was equally interested in kilns built by defendant and in those built by third persons; that is to say, he was interested in the royalty, license fee, or other consideration fixed as the price of the right to use the invention. It was in the invention, and in putting it on the market, that they were jointly interested. After providing that each party may use kilns embodying the invention, without paying for the right, the agreement is:

"It is hereby covenanted and agreed between the parties hereto * * * that the licensing of others to use said invention shall be upon the following terms and conditions, to wit."

Then follows the particular clause referred to, and later the one requiring the party of the second part to keep full and accurate accounts of the licenses granted to others, and the proceeds thereof, and to exhibit the same to the party of the first part. Having this meaning, there was no occasion for providing in the contract for sharing losses. There could be no losses, so far as complainant is concerned. There might be—there would be—some cost and expense incurred in selling licenses to use the invention, which would diminish the license fee, or royalty, or other consideration, exacted from the licensee. I find nothing in the contract which can be said to be opposed to the interpretation I have given it. The words "the proceeds thereof," in the clause last referred to, and the words "net proceeds," in the particular clause before referred to, refer to the proceeds of licenses, and not to proceeds of kilns, as kilns, manufactured and sold by the defendant. This interpretation of the contract seems to be accepted by neither of the contracting parties. I am not satisfied that the contract has received a practical construction opposed to the meaning of the words employed therein. I am satisfied that complainant's present contention cannot be sus-

tained upon the words of the contract, or such evidence of a practical construction thereof as is presented on the record. On the contrary, if he asserts the right to a share of the profits on kilns made by defendant, as kilns, he must take losses in manufacture, etc., into account. If we are to interpret the contract as one or other of the parties thereto now interpret it, an accounting should be ordered upon the basis indicated in the opinion of Mr. Justice MC-ALVAY. The court is not obliged to accept the interpretation of either of the parties. The bill prays that the court will interpret and construe the contract and determine the rights of the parties thereunder.

I am of opinion that an accounting should be had upon the basis indicated herein, and that neither party should recover costs of the appeal, but that costs should be divided equally between them.

BLAIR, STONE, and BIRD, JJ., concurred with OSTRANDER, J.