FARMERS' SUPPLY CO. *v.* INGLEWRIGHT.

1. EVIDENCE—CONTRACTS—SALES.

   Parol testimony is admissible to show that the defendant signed a writing in the nature of a receipt, without reading it, because he did not have his spectacles with him, and that the agent who read the terms to him omitted one clause wherein his satisfaction with the engine sold to him was expressed.

2. SAME.

Where the parties to an oral contract for sale later executed a writing, which, however, was not intended to take the place of the original agreement, it did not control so as to exclude parol testimony relating to the original parol agreement.

Error to Grand Traverse; Mayne, J. Submitted November 20, 1913. (Docket No. 114.) Decided March 27, 1914.

Assumpsit in justice's court by the Farmers' Supply Company against William H. Inglewright. From a judgment for defendant, plaintiff appealed to the circuit court. Judgment for defendant and plaintiff brings error. Affirmed.

*John W. Patchin,* for appellant.

*Parm C. Gilbert,* for appellee.

MOORE, J. This case was brought in justice's court. The case was appealed to the circuit court. At the conclusion of the testimony plaintiff asked for a directed verdict. This request was denied. The case was submitted to a jury, which returned a verdict in favor of defendant. From a judgment upon this verdict, the case is brought here by writ of error.

It is the claim of the plaintiff that its case is based upon two notes, one of which reads:

"TRAVERSE CITY, MICH., Oct. 24, 1910.

"No. 14.

"November 30th after date, for value received, I promise to pay to Farmers' Supply Company or order one hundred and ten dollars, payable at First National Bank, Traverse City, Mich., with interest at seven per cent. per annum.

"The consideration for which this note is given is one 6 h. p. Olds gasoline engine.

"And it is hereby agreed that the title to said property shall remain in said Farmers' Supply Company until said amount and interest thereon, or any renewal

note taken in lieu thereof, or any judgment rendered thereon, are paid in full. And it is further agreed that, in case of default in any payment of this note at the time above mentioned, or in case this debt shall become insecure, or in case of any attempt to dispose of said chattels, said Farmers' Supply Co. is hereby authorized to take possession of said chattels wherever found, and all payments made thereon shall be forfeited as stipulated damages, and, in case of such seizure, said Farmers' Supply Co. may, at its option, sell said chattels at public or private sale, such sale, if public, to be on like notice as is required by law for constable's sale on execution. The net proceeds of any such public or private sale, over the costs of said seizure and sale, to be applied on this note, and said note to be in force for any unpaid balance."

The other note reads just the same except as to the amount thereof.

It is the claim of the plaintiff that an order was given to it for the engine which reads:

"FARMERS' SUPPLY COMPANY,
"Dealers in Agricultural Implements and Machinery.
"TRAVERSE CITY, MICH., 9—19—10.
"I hereby agree to purchase from Farmers' Supply Co. one 6 h. p. Olds gasoline engine, with friction clutch pulley. To be delivered at Bendon on or about, soon.

"Freight to be paid by Farmers' Supply Co.

"Upon arrival of said engine I agree to receive it and settle for it on the following terms:

"Note, due Nov. 15, 1910, $110.00
"Note, due Nov. 15, 1911, $110.00.
"Note, due Nov. 15, 1912, $110.00.

"All notes to draw interest at seven per cent. per annum from date, until paid. Said engine warranted as per manufacturer's warranty.

[Signed]    "W. H. INGLEWRIGHT."

It is not claimed that a copy of the manufacturer's warranty was then or at any time delivered to defendant.

It is the further claim that the entire contract is

represented by the above-described writings, that afterwards the engine was delivered to defendant, who complained that it did not work, and that after some work had been done upon it defendant signed and delivered to the plaintiff a paper reading:

"SEAGER ENGINE WORKS.
"BENDON, 7—22—11.
"Your Mr. F. H. Myer called upon me and completed today the following adjustments and repairs on type A, size No. 6 h. p. No. D 1277, that I purchased in October, 1910, of you. Adjusted spark timing and valve lift, and put in new gasket under intake valve.

"These adjustments and repairs make this engine entirely satisfactory to me.
"W. H. INGLEWRIGHT."

The manufacturer's warranty reads as follows:

"We warrant that this engine is made of good material and workmanship, and if any part of this said engine shows defects in either material or workmanship within one year from this date of shipment, we agree to replace such defective parts free of charge at factory.          SEAGER ENGINE WORKS."

Defendant denies that this contract with the plaintiff is represented by these writings. His claim, briefly stated, is that plaintiff agreed to furnish him an engine that would actually develop 6 horse power, and would run certain specific pieces of machinery which were described, and that this bargain was an oral one, and in pursuance thereof the engine was ordered; that later a representative of the plaintiff company came to him and said that the engine had been ordered and was on its way, and a written order was desired, which plaintiff wanted in its dealings with the Seager Engine Works, and for that reason he signed the order. He claims this written order was not intended to take the place of the bargain that had been made between himself and the plaintiff, but was simply to be used between the plaintiff and the Seager Company.

The cross-examination of the principal owner of the plaintiff company tends to support defendant's contention.  It is in part as follows:

"*Q*. Now, this engine was shipped to him, or ordered shipped by the Farmers' Supply Co. to Mr. Inglewright, before you took that written order, wasn't it?

"*A*. I wouldn't say just the date.

"*Q*. Let me ask this:  When you came along by his place and asked him to sign that order, didn't you tell him then that the engine was on the way, had been sent on, and would be right there, but you wanted something to show the company that you had sold that engine; isn't that true?

"*A*. I think possibly it was; yes, sir.

"*Q*. And that the engine really was ordered by him at the store from you, and that he himself ordered it from you, and that he wanted a 6 horse power engine?

"*A*. He didn't tell me that; he told one of the other clerks.

"*Q*. Well, it was ordered here, in Traverse City, at your store?

"*A*. Yes, sir.

"*Q*. And the shipment was made on account of what he had said here, and then you went down there and took this order?

"*A*. Yes; that's the way it occurred.

'*Q*. So when you took this order, Exhibit C, at that time, the engine was on the way, and was expected to come to Bendon?

"*A*. I wouldn't be positive whether it was on the way.

"*Q*. Well, didn't you tell him so?

"*A*. I wouldn't say positively; but anyway the engine was ordered.

"*Q*. And he had been in the store before that, and had told the clerks what he wanted, and he understood that the engine was to be ordered for him on that?

"*A*. Yes; that is right.

"*Q*. Well, that was to be a 6 horse power engine?

"*A*. Yes.

"*Q*. That is what he talked?

"*A*. Yes.

"*Q*. And what you ordered for him?

"*A*. Yes.

"*Q*. And wasn't there talk in that connection—that he told you what he wanted to do with the engine, that he wanted it for cutting wood and running bean thresher?

"*Mr. Patchin:* We object to that; whatever the talk was was merged in this order, and a special order was given for a special engine. If the terms of it are unambiguous, it couldn't be varied or altered by what had gone before.

"*The Court:* Objection overruled. Answer the question. (Plaintiff excepts.)

"*Q*. He even talked with you people about getting him a threshing machine, and you told him that you could not supply him with one that fall?

"*A*. Yes, sir.

"*Q*. And that was here, in Traverse City, at the store, when he was in talking about the engine, and when it was arranged that you should order one for him?

"*A*. Yes, sir; he was talking about it at that time, but later we found out we couldn't get him a thresher."

It is the further claim of defendant that he never heard of the manufacturer's warranty until the trial. It is admitted by plaintiff none was shown him.

Defendant further claims that when the engine came it would not do its work according to the representation made to him, and that he notified plaintiff, and that from time to time it sent a man out to his place who did some work upon the engine, but that it would never develop six horse power, or do the work it had been agreed it should do.

Mr. Wynkoop gave testimony tending to show his company did not rely upon the manufacturer's warranty:

"I told him we didn't want him to pay for the engine until it was satisfactory; we wanted to make it satisfactory," etc.

Again:

"These different complaints of his had been com-

ing in along in different forms and at different times ever since he had the engine up to that time [July, 1911], and we [Farmers' Supply Company] had met those complaints by sending other people. I took an expert with me every time I went. Mr. Hall and Mr. Myer and Mr. Sessions had gone from my company. That is the way we had answered his complaints. My company was trying to get the engine to running to satisfy him that it would run, to make it satisfactory to him," etc.

It is the claim of the defendant as to the paper of July 22, 1911, accepting the repairs on the engine, that at the time it was signed he could not see to read without his spectacles, and that he so told the man who made the repairs, and that his spectacles were at his house, and the man stated he would read the paper to him, and that in doing so he omitted to read these words:

"These adjustments and repairs make this engine entirely satisfactory to me."

His testimony in that regard is sustained by the testimony of one of his neighbors who was present.

We think the cross-examination of the man who procured the paper tends to sustain defendant's version:

"Before I left Mr. Inglewright's, Mr. Wynkoop asked him to pay the note. I asked him to pay it. He said he would not pay it; that, if we thought we ought to have payment, we could take the engine. He signed this paper, saying this was satisfactory, and then turned around and refused payment."

The defendant gave further testimony tending to show that the engine would never do the work it was agreed it should do, that it was of no value to him, and that he had offered to return it to the plaintiff.

It will be seen that the claims of the parties were very diverse.

The jury was instructed in substance that, if the

writings contained the contract made by the parties, they should control, and plaintiff would be entitled to recover, but that, if the contract was oral, and the writings made later were not intended to take the place of the oral contract, if this and the other testimony justified them, they might find in favor of defendant.

The charge was a long one, and, if there was not to be a directed verdict, it fairly represented the conflicting claims of the parties.

The appellant insists the oral testimony was incompetent, that the writings control, and that the verdict should have been directed, citing *Nichols, Shepard & Co.* v. *Crandall,* 77 Mich. 401 (43 N. W. 875, 6 L. R. A. 412); *M. Rumely & Co.* v. *Emmons,* 85 Mich. 511 (48 N. W. 636); *Dowagiac Manfg. Co.* v. *Corbit,* 127 Mich. 473 (86 N. W. 954, 87 N. W. 886); *Williams* v. *Manufacturing Co.* 169 Mich. 676 (135 N. W. 954).

A reference to these cases will show they are distinguishable because, if defendant's claim is true, the parties never intended to merge the actual contract in the written one.

For the same reason, the case is unlike the case of *Minor* v. *Walker, post,* 645 (146 N. W. 305).

Judgment is affirmed.

McALVAY, C. J., and BROOKE, KUHN, STONE, OSTRANDER, BIRD, and STEERE, JJ., concurred.